688 P.2d 1063

The STATE of Arizona, Appellee,

v.

Saul Castillo RAMIREZ, Appellant.

No. 2 CA–CR 3336.

Court of Appeals of Arizona,
Division 2.

June 27, 1984.

Review Denied Sept. 20, 1984.

Robert K. Corbin, Atty. Gen. by William J. Schafer, III and Greg A. McCarthy, Asst. Attys. Gen., Phoenix, for appellee.

Robertson & Villarreal, Ltd. by Michael Villarreal, Florence, for appellant.

## OPINION

HOWARD, Judge.

The defendant, convicted by a jury of second-degree murder and theft of property of a value of more than $1,000, was sentenced to concurrent prison terms of 21 years and 5 years, respectively.

On January 10, 1983, the victim, Fred Smith, was discovered missing from his home in Superior, Arizona. His automobile was gone, the telephone, which had been torn from the wall, had blood on it. There were bloody streaks on the refrigerator and a puddle of blood on the porch.

On January 26, approximately 22 kilometers before Obregon, Mexico, Captain Nevarez of the Federal Police, stopped an automobile which had failed to dim its lights. The automobile was being driven by the appellant. He was not alone. There were some musicians in the car and a homosexual dressed like a woman. The appellant told the captain his name was Fred Smith and that he did not have any documents showing permission to have the car in Mexico, having lost them. The appellant then offered the officer $10,000 pesos if he would release him. This bribe was refused. Captain Nevarez looked in appellant's wallet and found some documents bearing Fred Smith's name. The wallet also contained a baptismal certificate in the name of Saul Castillo Ramirez, which appellant explained belonged to a friend of his to whom he was delivering it.

The appellant was arrested and an inquiry by Captain Nevarez of the Nogales office revealed that the car was stolen. Arizona authorities were informed of the arrest and on January 27 Sergeant Ramirez of the Superior Police Department, and three other officers, traveled to Obregon, Mexico. The car and appellant were brought back to Superior on January 29. During the trip back, after being advised of his *Miranda* rights, appellant told Sgt. Ramirez that Fred Smith's body could be found in a well near Eloy, Arizona.

On January 30 Rocky Jung, an identification technician with the Pinal County Sheriff's Department, located the well. It was approximately 20 inches in diameter. They found two gas tickets bearing Fred Smith's name at the well and some blood near the top of the well. A light and a hook were lowered down the well. A gold colored blanket which looked like it had blood on it was recovered near the 100-foot level. A green electric blanket was recovered at the 125- to 150-foot level. A shirt was also brought up. A video camera was lowered down the well and a video tape made. A jacket was recovered and then Fred Smith's body was found near the 300-foot level. The body was lifted up by means of a hook. It had been upside down in the

well and the left wrist of the body was bound by a wire.

The appellant testified at trial. He said he was a Mexican citizen and a migrant agricultural worker with a wife living in Eloy. He knew the victim, having worked for him in the past. He admitted he was at the victim's house on the evening of Sunday, January 9, 1983. He stayed there overnight in a shed or a "guesthouse". He left about 8:30 or 9:00 o'clock on the morning of January 10, 1983. He saw the victim at that time, alive and well. He hitchhiked to Eloy, arriving on the same day. On the second or third day that he was in Eloy, he was standing in front of the El Charro Bar, which he said was open, when a man he knew slightly, called Jesus Ortiz, drove up and asked if he knew where he could hide something. The appellant knew that Ortiz was involved with marijuana and thought Ortiz wanted to hide some of it so he got in the car and directed him to a well located two miles outside of town. Ortiz got out of the car and opened the trunk. The appellant got out to help him and as they were lifting a bundle of rags out of the trunk, Ortiz told him that they were going to take a trip to Nogales. It was dark and appellant could not see exactly what the bundle was. When they picked it up, appellant realized that the bundle of rags was a human body. It was still damp with blood. The appellant stopped helping and Ortiz threw the body down the well. Ortiz told him that he had hit the victim over the head. They departed for Nogales. Appellant went along because he had been compromised. He did not recognize the car that Ortiz was driving until they got to Nogales, when he realized it was the victim's car. They went from Nogales, across the border, heading for Hermosillo, Sonora. They stopped at the small town of Altar for gas. (We note that Altar is approximately 40 miles west of the main highway from Nogales to Hermosillo.) Once in Hermosillo, Ortiz went into a house of prostitution, leaving appellant with the keys to the car. Appellant waited all evening but Ortiz never came out so he left in the victim's car to

go find his parents. He was going to Obregon to see some friends of his parents when he was stopped by the police.

Certain evidence adduced by the state casts serious doubt upon appellant's testimony. An episcopal priest who lived across the street from the victim noticed that at approximately 8 a.m. on the morning of January 10 the gate was open and the victim's car was gone. According to the appellant, the victim was alive at this time. Also, the El Charro Bar was only open on weekends and could not have been open on the day appellant met Ortiz outside of the bar. Furthermore, although the appellant explained why he had the victim's car, he never gave an explanation as to why he had papers belonging to the victim in his wallet. But most striking is the incredulous coincidence that this Jesus Ortiz should happen to murder the man from whose home the appellant had departed two or three days previously. As for Ortiz, there was testimony that a Jesse Ortiz had lived in Eloy but he could not be found. Other facts shall be set forth as they pertain to the various issues under discussion.

Appellant contends that the trial court erred in (1) admitting hearsay statements of the victim under the residual hearsay exception to the hearsay rule; (2) admitting certain photographs and a video tape of the well where the victim's body was discovered; (3) in failing to direct a verdict; (4) in refusing to instruct the jury on lesser included offenses; (5) in instructing the jury regarding flight, and (6) in imposing an excessive sentence. We affirm.

## THE PHOTOGRAPHS AND VIDEO TAPE

The trial court admitted into evidence, over objection, a video tape showing the side of the well, a photograph of the decedent's bound and badly decomposed body, and the actual top portion of the decedent's skull. Appellant contends that these items lacked relevancy and unnecessarily inflamed the passion of the jurors. Photographs relevant to an issue in the case may be admitted into evidence to identify the deceased, to show the location of the mortal wounds, to show how the crime was committed and to aid the jury in understanding the testimony of the witnesses. *State v. Mohr*, 106 Ariz. 402, 476 P.2d 857 (1970). If the photographs have any bearing on any issue in the case they may be received although they may also have a tendency to prejudice the jury against the person who committed the offense. The discretion of the trial court will not be disturbed on appeal unless it has been clearly abused. *State v. Mohr*, supra. The video tape showed the well casing and the debris that was in the well. It shed light on how the body was disposed of and where the body was found. The video tape was used by a pathologist, Dr. Froede, in explaining the cause of death. He believed that death was caused by six blunt-forced blows to the head. Dr. Froede viewed the video tape, and concluded that the interior wall of the well casing did not contain any protrusions that could have caused these blows.

The calverium of the skull, which is its top part from above the eyes, was used here by Dr. Froede in his testimony. Dr. Froede testified that the calverium of the victim showed how the trauma might have been inflicted on the skull. He testified that the skull itself would be a greater aid to him in explaining than the color photographs that had been taken and explained to the court why this was so.

The photographs of the victim's body, as removed from the well, shows that his wrist was bound with a wire. Also, Dr. Froede identified the body reflected in the photograph as the body that he performed the autopsy on and Officer Jung identified the body as the body that he and his assistants removed from the well. Since the state had to prove under A.R.S. § 13–1104(A)(1) that the appellant intentionally caused the death of another person, the fact that one hand was bound with a wire bears on the issue of intent. Furthermore, the testimony identifies the body found in the well as the body upon which Dr. Froede performed the autopsy.

In *State v. Chapple*, 135 Ariz. 281, 660 P.2d 1208 (1983) the court stated that the language in *State v. Mohr*, supra, should not be interpreted to mean that any photograph which is relevant may be admitted despite its tendency to prejudice the jury. When an offered exhibit is of a nature to incite passion or inflame the jury, which apparently would be any photograph of the deceased, the court must go beyond the question of relevancy and consider whether the probative value of the exhibit outweighs the danger of prejudice created by admission of the exhibit. It is only if the photographs or exhibits have no tendency to prove or disprove any question which is actually contested that inflammatory exhibits should not be admitted. Here, the video tape of the inside of the well is not inflammatory in any sense. The other two exhibits helped to show the nature and location of the fatal injuries, illustrated or explained testimony, corroborated the state's theory of how the homicide was committed and helped determine the issue of intent. There was some suggestion by the defense that the victim was still alive when he was thrown down the well, allegedly by Ortiz, and that the blows which caused the death were caused by his head hitting the side of the well. This testimony dispelled such a notion. The trial court did not err in admitting these exhibits.

## SUFFICIENCY OF THE EVIDENCE

Appellant contends the trial court should have granted his request for directed verdict as to both counts. We do not agree. A judgment of acquittal should be granted only when there is no substantial evidence upon which a jury could determine that the appellant has committed the crimes he was charged with having committed. *State v. Blevins*, 128 Ariz. 357, 625 P.2d 946 (1981). Appellant contends that the evidence here was at best circumstantial and merely cast him in a suspicious light. This is mere wishful thinking. The evidence here is more than substantial.

## INSTRUCTION ON LESSER INCLUDED OFFENSES

The appellant submitted and requested jury instructions pertaining to the lesser-included crimes of manslaughter, negligent homicide and endangerment. It was appellant's position that the jury could have found that appellant acted negligently or recklessly in helping Jesus Ortiz. Furthermore, appellant argued that the jurors could have disbelieved Dr. Froede's testimony regarding the cause of death and found that the death could have occurred in the fall down the well. In this latter case, the appellant assisting Ortiz could be considered negligent or reckless so as to support jury instructions on the three aforementioned lesser-included crimes. We do not agree.

Rule 23.3, Arizona Rules of Criminal Procedure, 17 A.R.S., requires that a lesser-included offense be submitted to the jury. An instruction on the lesser-included offense is proper under Rule 23.3 if the crime is a lesser-included offense to the one charged and if the evidence otherwise supports the giving of the instruction. *State v. Celaya*, 135 Ariz. 248, 660 P.2d 849 (1983). To constitute a lesser-included offense, the offense must be composed solely of some but not all of the elements of the greater crime so that it is impossible to have committed the crime charged without having committed the lesser one. *State v. Celaya*, supra. Assuming arguendo that reckless manslaughter, negligent homicide and endangerment, are lesser-included offenses of second-degree murder, the trial court still did not err in refusing to give the instructions on lesser-included offenses, because there was no evidence upon which to justify the giving of such instructions. Appellant denied helping throw the body down the well. He claims that as soon as he felt the shoes and knew it was a body, he dropped it. Even if there were evidence that he helped throw the body down the well, there was no evidence that the victim was alive at that time. Dr. Froede testified that the victim was dead when he was thrown down the well and there was abso-

lutely no evidence to contradict it or no reason to disbelieve the doctor.

## THE FLIGHT INSTRUCTION

The jury was instructed:

"Running away or hiding after a crime has been committed does not in and of itself prove guilt. You may consider any evidence of the defendant's running away or hiding together with all the other evidence."

Appellant contends that there was no evidence of any flight which would justify the giving of this instruction. We do not agree. While merely leaving the scene does not constitute flight in Arizona, evidence concerning flight is admissible because flight raises an inference which, taken together with other evidence, points to a consciousness of guilt on the part of an appellant. *State v. Loyd*, 126 Ariz. 364, 616 P.2d 39 (1980). Here, immediately following the crime, appellant left the United States for Mexico. One of the officers who went to pick up appellant in Mexico testified that the appellant told him that they had taken the back roads. Tending to corroborate this admission is appellant's testimony that they gassed up in Altar, Sonora. Such testimony is consistent with taking the back roads and going across the border at Sasabe, an out-of-the-way port of entry, located west of Nogales, Arizona, rather than crossing at the border at Nogales, as testified to by appellant. The road from Sasabe goes directly to Altar and from Altar, to get to Hermosillo, one must travel approximately 40 miles east and tie into the Nogales-Hermosillo highway. Furthermore, once in Mexico, appellant concealed his identity by using the name of the victim and attempted to bribe the police in order to secure his release. All of this evidence justified the giving of a flight instruction.

## THE HEARSAY

The episcopal priest, Father Boes, testified that the victim came to his home about 7 p.m. on January 9, 1983 and stayed until shortly before 8 p.m. Father Boes, over appellant's objections, was also allowed to testify that the victim told him he was annoyed because a man refused to leave his home. He was also annoyed because this man had also been making telephone calls from his house. The evidence showed that appellant had made several long distance telephone calls from the victim's home prior to the murder. The trial court allowed this hearsay into evidence pursuant to Rule 804(b)(5), Arizona Rules of Evidence, 17A A.R.S. This exception to the hearsay rule allows evidence to be admitted if it possesses equivalent circumstantial guarantees of trustworthiness and is evidence of a material fact and the interest of justice would be served by its admission. In *State v. Robles*, 135 Ariz. 92, 659 P.2d 645 (1983), the court adopted the approach used by many of the federal courts in determining the admissibility of hearsay under Rule 804(b)(5). This approach requires the judge to look at each case individually and determine the reliability of the particular evidence based on whatever circumstances exist in that situation. In *Robles* the court mentioned factors which had been considered by the federal courts in determining the admissibility of this evidence: presence of oath or cross-examination; ability of declarant to perceive clearly; the amount of time; corroboration; self-incriminatory nature of the declaration; declaration was ambiguous and explicit, contrary to pecuniary interest and multiple levels of hearsay.

The only part of the hearsay that was not corroborated by other evidence or corroborated by appellant's testimony was the victim's statement that he was annoyed at this person because he made the phone calls and was annoyed because he would not leave, thus showing a possible reason for the homicide, in other words, an argument over either the phone calls or appellant not leaving which led to the victim's death. Therefore, we are only concerned here with the victim's statements that he was annoyed with the appellant and that the appellant refused to leave his house. What do we have here in the circumstances which sufficiently guarantee trustworthiness to these particular statements which

would allow them to come into evidence under the hearsay exception? The trial court was especially impressed with the fact that the witness testifying as to this conversation was an episcopal priest. He considered this a very strong guarantee of trustworthiness. But this misses the mark. It is not so much the trustworthiness of Father Boes that is important as is the trustworthiness of the victim. The state also pointed out to the trial judge that this statement was made to Father Boes prior to the time of the homicide, prior to there being any reason for the victim to make up a story. This is more of a circumstance of reliability than the fact that the person testifying at trial was an episcopal priest.

Rule 804(b)(5) requires, before admissibility, that the court determine (a) that the statement is offered as evidence of a material fact; (b) that the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts and (c) the general purpose of the rules and interests of justice will be best served by admission of the statements into evidence. Udall and Livermore in their work, The Law of Evidence, § 136, p. 306, boil it down to this. The statement must be strongly probative and circumstantially reliable. If this test is met the evidence should be admitted. The problem here is that we do not perceive the victim's statements to be strongly probative of why the appellant murdered the victim. Some gigantic leaps have to be made before one can arrive at a strong degree of probity. For example, let us take the victim's annoyance because appellant made long distance telephone calls. The logic would have to run like this: the victim was annoyed at appellant because he was making long distance phone calls and therefore appellant killed him. Or, the victim was annoyed at the appellant because he was making long distance calls, therefore they had an argument, and the appellant murdered the victim. Or, take the fact that appellant would not leave the house. The victim asked appellant to leave the house, therefore the

appellant killed him. Or, the victim asked the appellant to leave the house, whereupon there was an argument, and appellant murdered the victim. As can be seen, we do not have a case of the hearsay evidence being strongly probative but, instead, highly speculative. We believe the trial court erred in admitting the victim's statements as to his annoyance with appellant making long distance calls and appellant not leaving the house. However, we find such error to be harmless beyond a reasonable doubt. We find beyond a reasonable doubt that the error had no influence on the jury's verdict. See *State v. Hunter*, 136 Ariz. 45, 664 P.2d 195 (1983).

### THE EXCESSIVE SENTENCE

Appellant contends that since the trial judge did not find it necessary to impose an aggravated term on the theft conviction, he clearly abused his discretion by imposing the maximum term on the murder conviction. This non-sequitur has no merit. The trial judge found the following aggravated circumstances: infliction of serious physical injury and, in fact, death upon the victim; the use of a deadly weapon or dangerous instrument during the commission of the crime; the especially heinous, cruel and depraved manner in which the crime was either committed or the body was disposed of, that is, the wire coat hangar being around the wrist of the victim and the victim's body being found some 300 feet down an empty well casing; and also that the offense may have been committed during the commission of another crime, to wit, the theft of the automobile (that the offense may have been committed as a consideration of a taking of something of pecuniary value. See A.R.S. § 13–703(F)(5) and *State v. Gretzler*, 135 Ariz. 42, 659 P.2d 1 (1983)). The trial court then found that although the appellant had a good prior record, the aggravating circumstances outweighed the mitigating circumstances as to the murder. The fact that he did not also aggravate the sentence for the theft of the automobile does not show any inconsistency or any abuse of discretion.

The theft of the automobile was a class 3 felony. Since any aggravated sentence for the theft charge was to run concurrently with the murder charge, and would not have been equal to the time given on the murder charge, there was no logical reason for the court to give an aggravated sentence on the theft.

Affirmed.

BIRDSALL, C.J., and HATHAWAY, J., concur.