703 P.2d 510

**The STATE of Arizona, Appellee,**

v.

**Edward Lee ADAMS, Appellant.**

**No. 2 CA–CR 2786.**

Court of Appeals of Arizona,
Division 2, Department A.

March 8, 1985.

Review Denied May 7, 1985.

**568**

Robert K. Corbin, Atty. Gen. by William J. Schafer III and R. Wayne Ford, Phoenix, for appellee.

Frederic J. Dardis, Pima County Public Defender by Frank P. Leto, Tucson, for appellant.

## OPINION

HOWARD, Judge.

Appellant, convicted by a jury of three counts of molestation of a child, a non-dangerous, non-repetitive, class 2 felony, was sentenced on each count to concurrent presumptive sentences of five years' imprisonment. The victims in this case were three sisters—twins Coleen and Crystal, nine years of age and Cathy, seven years of age. In 1979 appellant, who was 19 at the time, was a babysitter for the children. He also used to take the girls swimming and to the movies. Near the end of the 1979 school year, appellant administered "medical exams" to all three girls. These exams consisted of having the girls remove their clothes after which he would feel all over their bodies including their vaginas. On different occasions appellant put his fingers into Coleen's vagina and had sexual intercourse with her. The same conduct was repeated with Crystal. These incidents were not discovered by the girls' mother until 1981 when a friend of the sisters told her own mother who, in turn, informed the victims' mother.

Appellant was arrested and interviewed by Detectives Taylor and Witte of the Pima County Sheriff's Office. The interview concluded with appellant making a taped statement confessing to having sexual intercourse with Coleen and Crystal and touching Cathy's vagina. Further facts will be set forth as they relate to the issues under discussion.

Appellant contends that the trial court erred in denying the motion to suppress his confession and in refusing to instruct the jury on his good character. He also contends that he was denied a fair trial because the jury received evidence that was not admitted during the trial and because

some members of the jury failed to answer questions posed on voir dire. He further contends that the mandatory imprisonment provision of A.R.S. § 13–1410 is unconstitutional as applied to him, i.e., a violation of the cruel and unusual punishment provision of the Eighth Amendment. We affirm.

## I.

Appellant contends that the trial court's admission of his taped confession was error because it was involuntary due to his mental deficiency and because of the police conduct in obtaining it.

In Arizona, confessions are presumed to be involuntary. The burden is on the state to demonstrate by a preponderance of the evidence that a confession was freely and voluntarily made and is not the product of physical or psychological coercion. In making its determination, the trial court must examine the totality of the circumstances. The trial court's determination will not be upset on appeal absent clear and manifest error. *State v. Hein*, 138 Ariz. 360, 674 P.2d 1358 (1983). Low intelligence, in itself, will not invalidate an otherwise knowing and intelligent waiver. *State v. Tothill*, 120 Ariz. 406, 586 P.2d 655 (App.1978).

Testifying at the motion to suppress was Detective Taylor. He testified that after arresting appellant he was taken to the sheriff's office and to a five-by-seven-foot room with a table in it where he was released from his handcuffs and, after being given his *Miranda* rights, was questioned for about an hour prior to giving his taped statement. Detective Taylor testified that appellant said he understood his *Miranda* rights and agreed to the interview. No threats of force or violence or promises were made. The officers proceeded by asking him first to tell them what happened. He denied the allegations against him and they continued to talk to him about them. The officers finally told him that they thought he was lying and that the little girls were telling the truth. Appellant still kept denying the charges. One of the officers told appellant that everybody has to answer to God for what they do and how did he think he would answer to God about this. Shortly after this was said, appellant got tears in his eyes and admitted to some of the acts of molestation. Throughout the interrogation one of the officers told appellant that a judge could order a person to have treatment and appellant could get treatment himself if he wanted it, that these kinds of problems were solved only by treatment and that one could not do so alone.

Appellant took the stand at the suppression hearing and testified. He stated that no threats or coercion were used. At no time during his testimony did he say that he did not understand the *Miranda* rights that were read to him. In fact, he specifically stated that he understood them. The only thing that he did say was that Officer Witte had promised him that he would ask the court to give him help for his problem if he needed it.

Testifying for appellant were three teachers involved in the special education program at Sahuaro High School who knew appellant. Appellant graduated from Sahuaro High School with a C plus average. His I.Q. in high school was 80, below average, and he had a mental age of 9 in terms of what he could visually perceive. One aspect of his deficiency when he was in school was his inability to understand what he heard and that he just parroted back. He tried to cover up his deficiency and some people would not be aware of the fact that he had a learning deficiency. When asked their opinion about appellant's statement to the police, his teachers stated that they thought that he would probably be confused during interrogation by the nature and speed of the questioning, that he possibly could have been intimidated by the police and that he did not understand his *Miranda* rights even if he said he did.

The trial court, after listening to the taped confession, found that appellant had been informed at least twice of his *Miranda* rights and also found appellant's confession to be voluntary and admissible.

The trial court had the opportunity to listen to and observe appellant on the witness stand as well as listen to the taped confession. We have also listened to the taped confession. Appellant's responses on the taped confession, as well as his testimony at trial, demonstrate that the answers are appropriate, fluent and discriminating. They do not show a person merely answering, "yes", "no", "maybe", or "I don't remember", to questions, but rather a person who understands what the charges are and their seriousness. We also note that at trial one of the teachers who testified at the motion to suppress, after hearing the taped statement, decided that appellant did in fact understand the questions that were being asked him by the police although he probably did not understand his *Miranda* rights. Coupled with these facts is the fact that on the witness stand appellant never said that he did not understand his *Miranda* rights, although there was ample opportunity for defense counsel to ask him that question. In fact, he said just the opposite. We do not believe the court erred in admitting the confession.

## II.

■■■ In connection with the confession, appellant tried to show at trial that Detective Taylor testified falsely when he said that he did not tell any falsehoods during interrogating when he told appellant that a person could get help if he were convicted. In cross-examination appellant wanted to ask Detective Taylor if he was aware that under Arizona law a person convicted of child molesting must be sentenced to prison for a minimum term of five years. The trial court refused to allow this question to be asked because it improperly placed the issue of punishment before the jury. Appellant contends that the court's refusal to let him ask this question denied his Sixth Amendment rights to confrontation and cross-examination. We do not agree. If cross-examination is unreasonably limited, defendant's conviction will be reversed on appeal. *State v. Dunlap*, 125 Ariz. 104, 608 P.2d 41 (1980). It is only where the limitation on cross-examination

is unreasonable that there is a Sixth Amendment issue. *State v. Williams*, 132 Ariz. 153, 644 P.2d 889 (1982). The test is the relevancy of the proposed examination. *State v. Navarro*, 132 Ariz. 340, 645 P.2d 1254 (App.1982). Here, we find nothing but a blatant attempt to get before the jury the mandatory nature of the punishment in order to secure the unwarranted sympathy of the jury. Such questions are improper. Possible punishment is irrelevant. *State v. Van Dyke*, 127 Ariz. 335, 621 P.2d 22 (1980); *State v. Burnetts*, 80 Ariz. 208, 295 P.2d 377 (1956).

## III.

■■■ Appellant contends that his confession was otherwise coerced and involuntary. He describes the use of what he calls the "Mutt and Jeff" routine, the "switching of tactics," and the narrow and barren room in which he was interrogated. However, appellant's characterization of the interrogation does not square with the facts. The "Mutt and Jeff" routine is an interrogation method formerly employed by law enforcement officers. In this technique one officer would play the "good guy" and one officer would play the "bad guy." The bad guy would be very, very bad indeed, sometimes even to the point of pretending that he was going to inflict physical violence upon the defendant if he did not talk and at times appearing to be emotionally out of control. The good guy then implored the defendant to deal with him in order to avoid having to deal with the bad guy. That technique was not used here. The allegedly coercive "switching of tactics" consisted of listening to appellant give a story and then telling him that they did not believe him. This could hardly be considered coercive. The room was small but allowed the existence of a table and chairs for everyone to sit around. While it was not as spacious and expansive as the lobby of the Algonquin Hotel, it did not, together with all the other circumstances, produce a coerced confession.

## IV.

Although appellant mentions the references to God and religion made to him by the detectives, he does not in his briefs specifically point to their use as a ground for vitiating his confession. However, pursuant to our obligation to search for fundamental error, we raise this issue.

■■■■■■ The standards which apply to confessions on admissibility in state courts are the same as in federal cases. Confessions must be free and voluntary, as was stated in *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964):

"... the admissibility of a confession in a state criminal prosecution is tested by the same standard applied in federal prosecutions since 1897, when, in *Bram v. United States,* 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568, the Court held that '[i]n criminal trials, in the courts of the United States, wherever a question arises whether a confession is incompetent because not voluntary, the issue is controlled by that portion of the Fifth Amendment to the constitution of the United States commanding that no person "shall be compelled in any criminal case to be a witness against himself."' [citation omitted] Under this test, the constitutional inquiry is not whether the conduct of the state officers in obtaining the confession was shocking, but whether the confession was 'free and voluntary; that is, [it] must not be extracted by any sort of threat or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence. * * *' " 84 S.Ct. at 1493.

Under pre-*Miranda* standards, confessions in response to an appeal through religious or moral sentiment were generally held to be admissible. *Roman v. State,* 23 Ariz. 67, 201 P. 551 (1921); In 3 J. Wigmore, Evidence § 840 (3d rev. ed. 1970), we find this quote from Joy, Confessions 51 (1842):

"It seems difficult to imagine that a man under spiritual convictions and the influence of religious impressions would therefore confess himself guilty of a crime of which he was *not* guilty; or that a man under the strong sense of his spiritual relations with God could hope to please God by a falsehood; that a 'confidence created' between him and his pastor, or the 'being thrown off his guard' by this confidence, should induce him, not to confess (*that* it might naturally do if he were guilty), but induce him to confess *falsely.* Such spiritual convictions, or spiritual exhortations, seem from the nature of religion, the most likely of all the motives to produce truth. They are therefore of a class entirely different from those that exclude confessions. A confession is excluded because the motive which induces it is calculated to produce untruth, because it is likely to lead to falsehood. If temporal hopes exist, they may lead to falsehood. Spiritual hopes can lead to nothing but truth." Wigmore, supra, at 480.

Thus, in *United States v. Carignan,* 342 U.S. 36, 72 S.Ct. 97, 96 L.Ed. 48 (1951) the defendant had been arrested for first-degree murder in attempting to perpetrate a rape. He was interrogated in the city jail by a United States marshal. There were pictures of Christ and various saints on the walls of the office in which the conversation occurred and the marshal evidently suggested to him that his Maker might think more of him if he told the truth about the crime. The defendant then asked to see a priest, and after talking to the priest admitted the killing. The court held that the uncontradicted facts did not bar the confession as a matter of law.

■■■■■ This does not mean, however, that the use of religious exhortations can never reach the point of being intimidating and coercive. For example, in *People v. Adams,* 143 Cal.App.3d 970, 192 Cal.Rptr. 290 (1983), the defendant was suspected of having shot her live-in boyfriend. She was interrogated by a sheriff who had known the defendant for three to five years through their attendance at a community church and through the defendant's employment at a Christian bookstore where

the sheriff had made purchases. He also knew that the defendant was suffering from nervousness and was having difficulty sleeping. The sheriff suggested to the defendant that if she admitted the shooting he would not be judgmental or think of her as less than a Christian or as something ugly. He told her that if she told the truth he would have much respect for her courage and that he was personally interested in being patient and listening to her tell the truth. He said there was accountability attached to her actions and that she knew this as a Christian and should she continue to deny accountability for what she believed she had done she would continue to have some problems and to experience more guilt. The sheriff then specifically referred to the first chapter of Romans from the Bible indicating that "God is a merciful God" who is interested in people's lives and accordingly has given man a set of rules and regulations to guide him in human government and personal living habits. He explained that the Bible states that if an individual chooses to disregard those rules by refusing to submit to them, God will cause that individual just to go his own way. In other words, God would turn his back on that individual, who would become a reprobate who can no longer distinguish between right and wrong. In this connection the sheriff was referring to living with somebody that wasn't the defendant's husband. He suggested that if the defendant continued to pursue her course of action by denying her guilt she was capable of experiencing the moral isolation and abandonment described in the Book of Romans.

The sheriff further stated that people who stop living according to God's law are bound to suffer some form of discipline. The sheriff referred to a book by a minister which included a description of a young woman in a mental institution. The thesis of the author as explained by the sheriff, was that the woman, diagnosed as a catatonic schizophrenic, was not mentally ill but was suffering from a "sin factor" arising from guilt over an adulterous relationship. The woman was consumed by guilt because she was not living according to God's rules and God had begun to deal with her. The sheriff told the defendant that he believed her situation correlated with that of the woman described in the book and further advised the defendant that she was a candidate for a nervous breakdown because she was not telling the truth. The California court held that this conduct constituted an exertion of improper influence upon the defendant, thus rendering her confession inadmissible.

 Here, the detective told appellant "everybody has to answer to God for what they do and how did [he] think he would answer to God about this." The detective's statement here does not reach the level of impropriety or improper conduct which was evident in the case of *People v. Adams,* supra. The detective's statement did not render the confession inadmissible.

### V.

 Appellant presented to the court the affidavits of two jurors which stated that while the children were testifying the jurors observed what appeared to them to be the father and a family friend giving hand and head signals to the children. According to the affidavits the children responded to these signals by answering "yes" or "no" depending on the signals given. Appellant moved for a new trial based on Rule 24.1(c)(3)(i), contending that the jurors were guilty of misconduct by receiving evidence not properly admitted during the trial. This is a patently absurd argument. The jurors were not guilty of any misconduct. They did not receive any evidence within the meaning of the rule. The situation here is no different from that in which the defense attorney, in response to an answer during cross-examination, makes a face or sneers, showing his displeasure at the answer. When the jury sees this, are they guilty of misconduct by receiving evidence not properly admitted during the trial? The answer is obviously no. The trial court did not err in failing to grant a new trial on this ground.

## VI.

The trial court, in its voir dire of the jury, asked them if there was anything about the nature of the charges which would make it such that they could not be fair and impartial jurors. Some of the jurors raised their hands in response to this question, and some of those jurors were excused. Appellant's motion for a new trial contained the affidavit of a juror which stated that during jury deliberations at least one member and maybe two members of the jury did state that acquaintances of theirs had been involved in situations involving incest or molestation but that no member of the jury stated that he or any relatives of his had been involved in an incest or molestation situation. Appellant contends that the trial court erred in failing to grant a new trial based upon the willful failure of a juror to respond to direct questions posed during voir dire. See Rule 24.1(c)(3)(iii). We do not agree. The transcript of the trial discloses that the jurors were not asked whether or not they had friends or relatives who had been involved in a child molestation case but only whether or not there was anything about the case that made it difficult for them to sit as fair and impartial jurors. The record does not disclose that any jurors failed to answer the court's question. The trial court did not err in failing to grant a new trial on this ground.

## VII.

At trial appellant presented evidence that established that there had been no previous complaints about him of sexual misconduct from police or associates or from any child who knew him. The evidence also showed extreme concern for the welfare of children. Appellant asked the court to give the following instruction on character evidence:

"Evidence of the defendant's character as to those traits which ordinarily would be involved in the commission of a crime such as that charged in this case is relevant to the question of defendant's guilt or innocence because it may be reasoned

that a person of good character as to such traits would not be likely to commit the crime of which the defendant is charged.

Evidence of good character may be sufficient to raise a reasonable doubt whether the defendant is guilty, which doubt otherwise would not exist."

Appellant contends the trial court erred in refusing to give this instruction. We do not agree. Assuming arguendo that there was sufficient character evidence to justify an instruction on the issue, appellant's instruction does not state the laws that exist in the State of Arizona. In *State v. Childs*, 113 Ariz. 318, 553 P.2d 1192 (1976) the supreme court stated that an instruction on good character must inform the jury that good character testimony in *connection with all the other evidence* may generate a reasonable doubt. The court approved RAJI CS11 which states, inter alia:

"Consider the evidence of good reputation together with all the other evidence. If you are convinced beyond a reasonable doubt that the defendant is guilty of the crime charged, you must not use the evidence of good reputation as an excuse to acquit the defendant." 113 Ariz. at 322, 553 P.2d 1192.

It is clear that the instruction offered by appellant in this case does not inform the jury that they must consider the character evidence together with all the other evidence. The offered instruction gives more weight to character evidence than any other item of evidence in the case. The instruction was clearly erroneous. The trial court did not err in refusing to give the instruction.

## VIII.

Appellant was sentenced to prison for 5.25 years, the minimum term for a class 2, non-dangerous, non-repetitive felony. Pursuant to A.R.S. § 13–1410 he must serve no less than five years in prison without release on any basis. Appellant points out that he is in his 20s, has never been in contact with the criminal justice system in any way, that he is a borderline

retarded individual with a learning disability, that since his high school graduation he has worked as a dishwasher and construction helper and has been involved in the Job Corps. He also points out that he has never been a discipline problem at home, work or school and that his step-father described him as being the least troublesome of all of his children to raise and as rarely in need of discipline. Furthermore, he has never used or abused any form of drugs or intoxicants and there is nothing in his background or behavior to indicate that he will be a repeat offender. He therefore concludes that the mandatory sentence in his case constitutes cruel and unusual punishment.

In *Rummel v. Estelle*, 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980), the United States Supreme Court discussed the cruel and unusual punishment clause of the Eighth Amendment as it applies to life imprisonment for a third felony conviction. The court rejected the disproportionality argument, noting that except for death penalty cases and unique punishments, sentence length is purely a matter of legislative prerogative.

In *Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983) the court seemingly weakened *Rummel* but continued to recognize the right of the legislature to establish penalties for felony offenses. It has previously been held in this state that a mandatory sentence is not per se cruel and unusual. *State v. Mulalley*, 127 Ariz. 92, 618 P.2d 586 (1980). There can be no doubt that child molesting constitutes a very serious offense and that mandatory sentences in such cases are justified. Appellant's argument apparently is that if you have been a "Boy Scout" until the time that you commit your first serious offense it is cruel and unusual punishment to impose a mandatory sentence upon you. Or, putting it a different way, if you have been good and kind, it would be cruel and unusual punishment not to let you have one bite of the apple. We do not agree with this concept and do not find that the man-datory punishment here is cruel and unusual.

Affirmed.

BIRDSALL, P.J., and FERNANDEZ, J., concurs.