750 P.2d 878

**The STATE of Arizona, Appellee,**

v.

**Hector Pesqueira CARRILLO, Appellant.**

**No. 2 CA–CR 4356.**

Court of Appeals of Arizona, Division 2, Department A.

Feb. 26, 1987.

Robert K. Corbin, Atty. Gen. by Bruce M. Ferg, Tucson, for appellee.

Charles L. Weninger, Tucson, for appellant.

## OPINION

FERNANDEZ, Judge.

Appellant was tried on three counts: first-degree murder, theft over $1,000 and second-degree burglary. After a jury trial, he was acquitted of the burglary charge and found guilty of theft and second-degree murder, together with a finding that the latter was a dangerous nature crime. He was sentenced to concurrent aggravated terms of 20 years for second-degree murder and 10 years for theft.

On appeal, appellant contends that the court erred in denying his motion to suppress statements, that appellant's comments to police while he was being transported to and from a mental examination should not have been admitted, and that the court erred in admitting hearsay. The state has also asked us to review another area for possible reversible error, since brief references were made by two witnesses and by the prosecutor to appellant's belated invocation of his right to remain silent after having spoken at length to the police. We have reviewed all the contentions and find no error.

The body of the victim, Bruce Johnson, was found with 33 stab wounds in it on December 11, 1984. The medical examiner estimated that death occurred on December 9 or 10. The victim's abandoned car was found on December 18 a few blocks from appellant's apartment. Gene Verhaagen, a long-time friend of the victim, had a telephone conversation with the victim at about 6:30 p.m. on December 9. While they were on the phone, the victim spoke to someone in the house with him, saying words to the effect, "Hector, don't do that now," or "Hector, we will do that later." The victim then explained to Verhaagen that the man was there to do some gardening the following day. The victim also said that the same man had been there the previous week, that he (the victim) had awakened at 2:00 in the morning to find Hector fixing a meal in the kitchen and that he had asked Hector to leave.

After Verhaagen heard that Johnson had been killed, he informed the police of this conversation. Another friend of Johnson's gave the police appellant's name, and a third individual informed the police that he had had a two-year homosexual relationship with appellant.

With this information, Detective Edward Gonzales, along with another Tucson police officer, learned of an outstanding misde-

meanor traffic warrant on Hector Carillo. Although they used the traffic warrant as their ostensible purpose for visiting appellant on December 20, 1984, they were actually interested in the Johnson murder case. Appellant denied having received any traffic citations, and since it is Tucson Police Department policy not to arrest on a misdemeanor warrant when the person denies its existence, they asked appellant to go to the police station to clear up the matter. Detective Gonzales told appellant he was not under arrest, and appellant agreed to go to the police station. The police did not handcuff him for the trip. Appellant agreed to have his fingerprints taken, which were checked against latent prints found at the murder scene although appellant did not know that. He was then taken to an interview room. At no time did appellant express any desire to leave the station. The appellant's fingerprints did not match the prints found at the murder scene.

The first part of the interrogation was not tape-recorded. The police and appellant first discussed the traffic warrant and then a previous arrest. They then asked if appellant did yard work, if he had sex with men for whom he did yard work, if he knew the location of Johnson's house, if Johnson had become angry with him for cooking, if he knew where the phones were in Johnson's house, if the man's name was Bruce and if he knew the description of the man's car. Detective Gonzales then asked appellant if he had killed Johnson, and appellant replied that he had stabbed him but had not meant to kill him.

Detective Gonzales testified that it was only at that point that there was cause to believe that appellant was involved in the murder. Then a tape recorder was set up and appellant was given his *Miranda* warnings. Appellant said he understood his rights and was willing to answer questions.

Gonzales then obtained a statement in which appellant admitted to having stabbed Johnson several times, supposedly after Johnson took a green pill and violently chased appellant through the house. In his statement, appellant also described the incident when he was thrown out of the house for cooking in the middle of the night, and he mentioned that Johnson had received several phone calls the evening of the killing.

The detective knew before he interviewed the appellant that previous charges against him had been dismissed because he had been found to be incompetent to stand trial. Because of that knowledge, the detective arranged to have Dr. Kevin Gilmartin, a psychologist and a deputy sheriff, interview appellant for the purpose of developing information that could be used by mental health experts should appellant's competency later be questioned.

After appellant was charged with the crimes, he filed a Rule 11 motion. Pursuant to the motion, the same two detectives accompanied appellant on March 21, 1985, to the Phoenix office of psychiatrist Dr. Otto Bendheim for a court-ordered mental examination. When they arrived at Dr. Bendheim's office, Detective Gonzales asked appellant if he remembered them, and appellant responded "Yeah, I shouldn't have said nothing to you guys." When they left the doctor's office, the detective told appellant they were returning to Tucson, and appellant said, "Take me to the state hospital; I can escape from there."

A lengthy Rule 11 hearing revealed that appellant suffers from mild to moderate mental retardation. Two mental health experts concluded that appellant was not competent to stand trial because of his limited intellectual capacity. Another expert disagreed, concluding that appellant was competent to stand trial. After an additional expert interviewed appellant and concluded that he was competent, the court found him competent to stand trial and to assist his counsel in his defense.

In ruling on the motion to suppress the statements made by the appellant, the court considered the mental health testimony that had been elicited at the Rule 11 hearing. At the start of trial, the court ruled that all appellant's statements were voluntarily made.

## ADMISSION OF APPELLANT'S STATEMENTS

### Statements at Police Station

Appellant contends that the statements made at the police station were not made

voluntarily within the meaning of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In determining the voluntariness of a confession, the court must assess the totality of the circumstances and decide whether the free will of a defendant was overcome by the actions of the police. *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *State v. Ferguson,* 149 Ariz. 200, 717 P.2d 879 (1986). The question of whether a person is in custody at the time of interrogation and thus entitled to *Miranda* warnings is judged by a multi-factor objective test. Among the factors which the court must review in determining if the defendant was in custody are the existence of objective indicia of arrest, the site of the interrogation and whether the investigation had focused on the accused. *State v. Carter,* 145 Ariz. 101, 700 P.2d 488 (1985).

We first examine the objective indicia of arrest. Appellant had been specifically told he was not under arrest in accordance with Tucson Police Department policy on disputed misdemeanor warrants. Appellant voluntarily accompanied the officers to the police station. There were no restraints or guns used by the officers. Appellant voluntarily agreed to have his fingerprints taken. At no time did appellant express a desire to leave the station.

Next, we consider the site of the interrogation. It is true that the questioning of appellant at the police station is a factor that enhances the coercive nature of the interrogation. However, the fact that appellant was questioned at the police station by itself does not indicate that the interrogation was custodial. *Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); *State v. Perea,* 142 Ariz. 352, 690 P.2d 71 (1984); *State v. Garrison,* 120 Ariz. 255, 585 P.2d 563 (1978). The record does not show that any coercive action took place at the site of the interrogation in this case.

The length and form of the interrogation are important factors to be considered. In this case the officers arrived at the appellant's residence at 2:30 in the afternoon, and about 10 minutes later the appellant accompanied them to the police station which was located nearby. Appellant's fingerprints were then taken and compared to the latent fingerprints found at the Johnson residence. After learning that the latent prints were not those of the appellant, the detectives questioned appellant. Detective Gonzales testified that by 3:05 p.m., he had either started the interview or had placed appellant in the interrogation room. The untaped interview lasted approximately 15 minutes. While this time estimate may be low, it is comparable to the approximately one-hour interrogation which the court found to be unexceptional in *State v. Carter,* supra. Although it is true that the officers used the misdemeanor warrant as a means of making the initial contact, we find no inducements, falsehoods or psychological ploys in the interrogation itself.

The investigation had not focused on appellant at the time of the interrogation, and the officer lacked probable cause to arrest until appellant admitted stabbing Johnson. At that time the *Miranda* warnings were required and were given by the officer. See *State v. Cruz–Mata,* 138 Ariz. 370, 674 P.2d 1368 (1983); *State v. Morse,* 127 Ariz. 25, 617 P.2d 1141 (1980).

The remaining factor to be considered is appellant's mental condition. The court must scrutinize with special care a confession from one of low mentality. *Fikes v. Alabama,* 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957). The test for voluntariness in cases involving a defendant with mental disabilities is "whether these problems render him unable to understand the meaning of his statements." *State v. Clabourne,* 142 Ariz. 335, 342, 690 P.2d 54, 61 (1984). Appellant is unquestionably somewhat retarded, but that is not enough by itself to render the statements involuntary. *State v. Adams,* 145 Ariz. 566, 703 P.2d 510 (App.1985).

Here the court had the benefit of the testimony of four mental health experts, three of whom believed the appellant had the capacity to understand his constitutional rights and that the statements were knowing, intelligent and voluntary. The other expert believed that appellant did not

have the capacity to understand his constitutional rights. Considering all the circumstances, we find that the appellant's statements were properly admitted.

### Statements on Phoenix Trip

A communication only amounts to an interrogation for the purposes of *Miranda* if the officers should have known that it was likely to elicit an incriminating response. *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). Since both statements were volunteered in this case, we find no error in the court's refusal to suppress them.

■ Appellant urges that the statement regarding the state hospital was irrelevant and prejudicial, citing Rules 401 and 403, Rules of Evidence, 17A A.R.S. (1986 Supp.). Even though this objection is made for the first time on appeal, we find the statement to be relevant. Appellant's main defense was incompetency, and the jury was informed through numerous witnesses of appellant's previous stays at the state hospital. See *State v. Ferguson*, supra.

### ADMISSION OF HEARSAY EVIDENCE

Appellant contends his hearsay objection to the testimony of Gene Verhaagen regarding his December 9 telephone conversation with Bruce Johnson should have been sustained. We disagree. The conversation included three statements to which Verhaagen testified, and all three were admitted by the court pursuant to Rule 804(b)(5), Rules of Evidence, 17A A.R.S. (1986 Supp.), under the "other exceptions" section. The court made the following findings under Rule 804:

> THE COURT: The motion to preclude his testimony is denied under rule 804, the Court finds that the statement is offered as evidence of a material fact; the statement is more probative on the point for which it's offered than other evidence which the State can procure through reasonable efforts and that the general purpose of these rules and the interests of justice are best served by the admission of the statement into evidence.

The Court further finds that the statement was made under circumstances which guarantee trustworthiness.

■ The first remark by Johnson, "Hector, don't do that now," or "Hector, we will do that later," is not hearsay at all. Evidence Rule 801 defines hearsay as a statement and defines a statement as an assertion. " 'The key to the definition is that nothing is an assertion unless intended to be one.' " *United States v. Zenni*, 492 F.Supp. 464, 468 (E.D.Ky.1980), quoting Advisory Committee Note to Federal Evidence Rule 801. This remark by Johnson is probative because it shows that a person named Hector was in Johnson's home at that time, but Johnson was not intending to assert anything by making the statement. Evidently he was attempting to make Hector stop doing something. Hence, the remark was not hearsay. See M. Udall & J. Livermore, Arizona Law of Evidence § 123 (2d ed. 1982). We find the first remark was properly admitted, even though the wrong reason may have been given by the court. *State v. Mincey*, 130 Ariz. 389, 636 P.2d 637 (1981), cert. denied, 455 U.S. 1003, 102 S.Ct. 1638, 71 L.Ed.2d 871 (1982).

■ As to the remaining statements by Johnson, the court's ruling included specific findings which met all elements of Rule 804(b)(5). Appellant questions the court's finding that the statements were made under circumstances which guaranteed trustworthiness. We note that appellant's statement to the police corroborated these statements. Johnson related to his friend a situation that involved Johnson personally in his own home within a recent time span. The fact that Johnson had another friend by the name of Hector did not create any ambiguity in the statements, since the state showed that the other Hector was out of the country during the relevant time period. There was no evidence that Johnson had any reason to make up the statements, and appellant has not pointed to anything in the record which would indicate that the remarks were untrustworthy. See *State v. Best*, 146 Ariz. 1, 703 P.2d 548 (App.1985); *State v. Ramirez*, 142 Ariz. 171, 688 P.2d 1063 (App.1984). We find no abuse of dis-

cretion by the trial court in admitting them. *State v. Robles*, 135 Ariz. 92, 659 P.2d 645 (1983).

### COMMENTS ON APPELLANT'S CLAIM OF RIGHTS

 Finally, the state in its answering brief noted that brief references were made by two witnesses and by the prosecutor to appellant's belated invocation of his rights after he had spoken at length to the police. We have reviewed the record on this issue and find that the remarks by the two witnesses were non-responsive answers to questions they were asked. The remark by the prosecutor was an incidental reference to the issue raised by the defense as to whether or not appellant had voluntarily waived his right to remain silent. In view of all the circumstances, we find no reversible error. If there is any error, it is harmless beyond a reasonable doubt. See *State v. Anderson*, 110 Ariz. 238, 517 P.2d 508 (1973); *State v. Robinson*, 127 Ariz. 324, 620 P.2d 703 (App.1980), cert. denied, 450 U.S. 1044, 101 S.Ct. 1765, 68 L.Ed.2d 242 (1981).

Affirmed.

HATHAWAY, C.J., and HOWARD, P.J., concur.