750 P.2d 883

**The STATE of Arizona, Appellee,**

**v.**

**Hector Pesqueira CARRILLO, Appellant.**

**No. CR–87–0092–PR.**

Supreme Court of Arizona, En Banc.

Feb. 2, 1988.

Robert K. Corbin, Atty. Gen. by Bruce M. Ferg, Asst. Atty. Gen., Phoenix, for appellee.

Charles L. Weninger, Tucson, for appellant.

FELDMAN, Vice Chief Justice.

Hector Pesqueira Carrillo was convicted of second-degree murder, A.R.S. § 13–1104, and theft by controlling stolen property with a value of over $1,000, A.R.S. § 13–1802(C). The state alleged and proved that the murder was of a dangerous nature. A.R.S. § 13–604. The trial judge sentenced the defendant to concurrent aggravated terms of twenty years for second-degree murder and ten years for theft. Carrillo petitions for review. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5 and A.R.S. §§ 13–4033 and –4035.

## FACTUAL AND PROCEDURAL SUMMARY

Bruce Johnson was killed on December 9 or 10, 1984. One of Johnson's coworkers discovered the body at the victim's Tucson home on December 11, and immediately summoned the authorities. The medical examiner concluded that death occurred a day or two earlier as the result of multiple stab wounds to the chest. The assailant had inflicted other nonlethal wounds, breaking off a knife blade that remained imbedded in Johnson's spine. There was no indication of a break-in or of pilferage

other than the absence of Johnson's keys and automobile. The police found the car about one week later parked several blocks away.

Tucson Police Department Detective Edward Gonzales took charge of the homicide investigation. He was assisted by Detective Perry Lowe. Detective Gonzales supervised an intensive effort to find and analyze all of the available physical evidence, collecting hair and blood samples, checking for latent fingerprints, and interviewing Johnson's neighbors, friends, and fellow employees. Leads developed as friends and coworkers compared notes on their last contacts with the victim.

One of Johnson's friends recalled a telephone conversation with Johnson at about 6:30 p.m. on December 9. The victim spoke to someone in the house, saying "Hector, don't do that now," or "Hector, we will do that later." Johnson explained the interruption by saying that the man there would do some gardening the next day. He added that the same man had been there last week and that Johnson had awakened at 2:00 a.m. to discover Hector preparing a meal and had asked Hector to leave. Other friends told the police that the "Hector" referred to was probably Hector Pesqueira Carrillo, the defendant, and that Johnson and Carrillo had had a two-year homosexual relationship. The police also learned that Carrillo had worked for Johnson as a gardener.

Armed with these facts, the police investigation focused on defendant. Police records showed that Carrillo had been arrested for child molestation, trespass, and for three separate arson incidents. On each occasion, the charges were dismissed because the court determined Carrillo was severely mentally retarded and incompetent to stand trial. At this point, while the police had only circumstantial evidence against Carrillo, he was the only suspect.

In an effort to fully interrogate Carrillo, Detective Gonzales decided to employ a misdemeanor traffic warrant that was then outstanding on a person named Hector Carrillo. Detectives Gonzales and Lowe used the traffic warrant as a pretext to visit the defendant on December 20, 1984. The true purpose of this operation was to talk about the Bruce Johnson investigation. Detective Gonzales knew that the defendant was mentally deficient at the time of this first contact. They tried to persuade him to go to the police station because it was Tucson Police Department policy not to arrest on a misdemeanor warrant when the suspect denied its existence. Detective Gonzales told Carrillo that he was not under arrest and Carrillo agreed to go downtown to the station house to be questioned about the traffic offense. The police did not handcuff him for the trip to the station house, which was only a few blocks away.

Gonzales placed Carrillo in a small interview room and began the interrogation. It was independently obvious to him at that point that Carrillo was indeed mentally deficient. Detective Gonzales did not give defendant *Miranda* warnings [1] when he began the interview. In the first part of the session, which was not tape-recorded, Gonzales briefly discussed the traffic warrant and then shifted the focus to a previous arrest for child molestation. Carrillo became increasingly reluctant to talk at that development. Gonzales next asked a series of questions seeking a connection between the victim and Carrillo and eventually "dropped it on him that we were investigating the murder of Bruce Johnson and I asked him if he killed him." [2] Carrillo said that he had stabbed Johnson but that he did not mean to.

Detective Gonzales then turned on his tape recorder and advised Carrillo of his *Miranda* rights in simplified form to ensure that Carrillo understood them. Defendant confessed to the crime and repeated the confession in substantially similar detail a few minutes later to a police psychologist. Significantly, when Detective Lowe began the third round of questions a short time later, Carrillo finally invoked his *Miranda* rights, did not answer

---

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2. Trial Transcript (TT), Sept. 10, 1985, at 20.

any more questions, asked for an attorney, and then refused to speak. Other than these confessions, there was no direct evidence placing Carrillo at the scene of the murder. The defendant was not matched to any of the blood or hair samples nor to any of the fingerprints found at the victim's home and on the victim's car.

Carrillo was charged with first degree murder, burglary, and theft. He then filed a motion for mental examination. Rule 11, Ariz.R.Crim.P., 17 A.R.S. The trial court's extensive Rule 11 hearing disclosed that Carrillo suffers from mild to moderate mental retardation. Two mental health experts concluded that Carrillo was incompetent to stand trial. Two other experts disagreed. The trial court found the defendant competent to stand trial.

The defendant also moved to suppress the confessions and statements that he had made. The trial court concluded that the statements fit within hearsay exceptions and that the confessions were voluntarily made. They were presented to the jury at trial. So, also, was the question of voluntariness. In order to bolster the contention that Carrillo had voluntarily confessed, the prosecutor referred to Carrillo's invocation of his *Miranda* rights and elicited testimony from two prosecution witnesses concerning Carrillo's resort to his constitutional rights.

The jury convicted Carrillo of second degree murder and theft. The trial court sentenced him to concurrent sentences of twenty years for the murder and ten years for the theft. Carrillo appealed his conviction to division two of our court of appeals. He asserted that the trial court had committed four serious errors: First, the confessions were not voluntary. Second, comments made to police taking him to a psychiatrist's office were involuntary, irrelevant, and unfairly prejudicial; they should not have been admitted. Third, the court erred in admitting the hearsay statements about the conversation between the victim and a friend concerning a "Hector" who had been at Johnson's house on December 9, 1985. Fourth, the prosecutor and two witnesses had improperly commented on

Carrillo's invocation of his rights to remain silent and right to counsel after the initial police interrogations. The court of appeals affirmed the conviction. *State v. Carrillo*, 156 Ariz. 120, 750 P.2d 878 (App.1987). Carrillo petitioned this court to review, asserting the same four grounds raised in the court of appeals.

We granted review only on the first and fourth issues. These issues present questions of first impression. *See* Rule 31.19(f), Ariz.R.Crim.P., 17 A.R.S.

## A. GOVERNMENT COMMENTARY ON DEFENDANT'S INVOCATION OF HIS CONSTITUTIONAL RIGHTS

■ Defendant claims that the trial judge erred in admitting evidence of defendant's invocation of his *Miranda* rights. Protection against compelled evidence or testimony is given in the fifth amendment to the United States Constitution and art. 2, § 10 of the Arizona Constitution. Before the results of any custodial interrogation may be directly used by the state, the authorities must tell the defendant that he has the right to remain silent as well as the right to the assistance of counsel. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Arizona courts have recognized that the protection against self-incrimination includes freedom from adverse consequences flowing from defendant's exercise of his right. Thus, the prosecutor may not raise an inference of defendant's guilty mind by remarking upon the silence of a suspect who exercised his *Miranda* rights. *State v. Villalobos*, 6 Ariz.App. 144, 430 P.2d 723 (1967). Normally, any reference by judge or prosecutor to a defendant's protected silence will constitute fundamental error. *State v. Anderson*, 110 Ariz. 238, 517 P.2d 508 (1973).

Federal caselaw discloses an instructive evolution of this principle. In *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed. 2d 91 (1976), the defendants offered an exculpatory explanation for their participation in an alleged drug transaction. On cross-examination the prosecutor asked them why they had not explained their

conduct at the time of arrest. The Court held that the cross-examination was fundamentally unfair and violated the due process clause of the fourteenth amendment. Even though defendant's invocation of rights might raise an inference of his consciousness of guilt, the Court concluded that the *Miranda* warnings carried an implicit assurance that a defendant's choice to remain silent would carry no penalties. 426 U.S. at 618–19, 96 S.Ct. at 2245. The Court has repeatedly recognized that the *Miranda* warnings convey such an implied promise to an arrested person. *See, e.g., Fletcher v. Weir,* 455 U.S. 603, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982).

Of greatest relevance to the present matter is *Wainwright v. Greenfield,* 474 U.S. 284, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986). In that case, the defendant in a state prosecution pleaded not guilty by reason of insanity. The prosecutor presented the testimony of two police officers who related how the accused had received the *Miranda* warnings and then declined on four occasions to speak with the police and asked for an attorney. Despite timely objection, in closing argument the prosecutor suggested that defendant's repeated invocations of his constitutional rights demonstrated a degree of comprehension inconsistent with a claim of insanity. On appeal, the state argued that the evidence of rights invocation was uniquely probative of sanity and therefore properly admitted.

The majority concluded that prosecutorial comment on defendant's invocation of his *Miranda* rights violated the implied assurances found in those warnings. The state's attempt to distinguish *Doyle* on the grounds that reference to invocation of *Miranda* rights on the sanity issue merely rebutted the accused's claim of insanity left Justice Stevens unpersuaded:

> We find no warrant for the claimed distinction in the reasoning of *Doyle* and of subsequent cases. The point of the *Doyle* holding is that it is fundamentally unfair to promise an arrested person that his silence will not be used against him and thereafter to breach that promise by

using silence to overcome a defendant's plea of insanity. In both situations, the state gives warnings to protect constitutional rights and implicitly promises that any exercise of those rights will not be penalized. In both situations, the state seeks to make use of the defendant's exercise of those rights in obtaining his conviction. The implicit promise, the breach, and the consequent penalty are identical in both situations.

474 U.S. at 292, 106 S.Ct. at 639. *See also State v. Mauro,* 149 Ariz. 24, 32, 716 P.2d 393, 401 (1986), *rev'd on other grounds,* —— U.S. ——, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987).

These principles are difficult to apply to the facts of the case at bar. The trial judge had denied the motion to suppress defendant's confessions, leaving the ultimate decision on voluntariness to the jury. Carrillo claimed that the confessions were involuntary because, given his low intellect and the inherently coercive surroundings, he had not comprehended his right to remain silent and his will had been overcome. Thus, he argued, his confessions were both involuntary and unreliable as the product of subtle psychological compulsion. On the fourth day of Carrillo's trial, the prosecutor sought to have a police psychologist tell the jury the basis for his opinion that Carrillo's confession was voluntary. The prosecutor explained his position while arguing the point to the judge:

> PROSECUTOR: ... when they finished [the interrogation] one of the things that [the police psychologist] says [is] he has an initial concern about the ability [of Carrillo to understand his rights]. Then he reads the second part, which is with Detective Lowe, when [Carrillo] talks to Detective Lowe and said ... I ain't going to answer any more questions.... That's part of what [the police psychologist] is basing his opinion [of voluntariness] on as well.
>
> In addition to that [Carrillo] says, where is my lawyer[?] [3]

3. TT, Dec. 13, 1985, at 170.

After this statement and some ambiguous repartee, the prosecutor received judicial permission to question the psychologist about the significance of the defendant's invocation of his constitutional rights to silence and to speak with his attorney. The prosecutor first elicited testimony arguably establishing that Carrillo was intellectually capable of voluntarily confessing to Johnson's murder. Carrillo's lawyer objected to this entire process. Naturally enough, having permission to bring up the invocation, the prosecutor did so, again over objection:

Q. [PROSECUTOR] After having conducted that review [of records, transcripts and statements] and after having told the jury your initial impression, *do you have an opinion as to whether Mr. Carrillo in December of 1984 was capable of understanding his Miranda rights,* his right to remain silent, his right not to talk to you, and his right to have an attorney if he wanted one?

A. [POLICE PSYCHOLOGIST] Yes, *I believe Mr. Carrillo understood that and he exercised those rights.*

Q. *Do you have an opinion as to whether or not he was capable at that time in December of 1984 of voluntarily, knowingly and intelligently waiving the rights* that he was entitled to?

A. *My opinion would be based on the fact that Mr. Carrillo told Detective Lowe that he did not choose to answer any more questions; in fact he didn't, he just became quiet.* He understood that he did not have to speak with Detective Lowe. He demonstrated that on several occasions ...

At one point, there was concern he had to have his pants taken off for evidence purposes. Mr. Carrillo said, I'm not going to take my underwear off. Which demonstrated to me that he understood he had the capacity to refuse to cooperate with the police and *he had the capac-*

*ity to not speak with the police. And at that point he didn't. He refused to speak and he became silent.*

Q. All right. And the transcript that you have in front of you and the transcript of the conversation that Detective Lowe had, Detective Lowe had with Mr. Carrillo, you have reviewed that as well, and you indicate that as part of the conversation with Mr. Carrillo, and *part of the reason for the basis of your opinion that Mr. Carrillo did understand and was capable of invoking his rights is because he made a comment to Detective Lowe, I don't want to answer any more questions?*

A. Yes.[4]

\* \* \* \* \* \*

Q. [W]as there anything at all about the questions that you asked and the information that he provided you with and your subsequent review of materials that indicated that he is not capable of understanding his Miranda rights, if they are explained to him carefully, and not capable of waiving those rights?

A. I think if one takes into consideration that Mr. Carrillo has a linguistic handicap and an intellectual handicap and one moves slowly and makes sure he understands what his rights are and he understands the nature of the conversation, *I was very comfortable he understood his rights and waived his rights and at one point during the conversation with the homicide detective that he executed his rights and he became silent and he stated to the detective that he didn't want to answer any more questions and he became quiet.*[5]

The prosecutor used this testimony in final argument:

Clearly Hector Carrillo knew he didn't have to talk to them [the investigating officers]. What does he say when Detec-

---

**4.** TT, Dec. 13, 1985, at 186–88 (emphasis added).

**5.** TT, Dec. 13, 1985, at 223–24. Several days later, the prosecutor obtained agreement from one of the defendant's expert witnesses that Carrillo's statements were consistent with the conclusion "Mr. Carrillo understands that he doesn't have to talk to police officers." TT, Dec. 17, 1985, at 30. This type of neutral observation was relatively harmless and inadvertent when compared with the extensive testimony of the police psychologist.

tive Lowe comes in, I'm not going to answer any more questions.[6]

The court of appeals concluded that the police psychologist was merely making nonresponsive answers to the prosecutor's questions. Moreover, the court found that the prosecutor's statement in closing argument was merely "an incidental reference to the issue raised by the defense as to whether or not appellant had voluntarily waived his right to remain silent." 156 Ariz. at 125, 750 P.2d at 883. We disagree.

Having received permission to do so, the prosecutor deliberately questioned the police psychologist about the defendant's invocation of his right to remain silent and his right to consult with an attorney. The answers responsively described the defendant's exercise of his constitutional rights. The evidence was relevant to the key issue in the case—the voluntariness and reliability of defendant's confession, which was the only substantial evidence connecting him with the crime. On final argument, the prosecutor pressed the point home to the jury. There was nothing incidental or accidental about the entire procedure.

 The inquiry would be over at this point if the state were attempting to use this evidence to establish Carrillo's consciousness of guilt or his sanity. The first use is prohibited by *Doyle*, the next by *Wainwright*. However, in the present case, Carrillo claimed he had not understood his rights and had not made a knowing waiver of his rights. When Carrillo stopped the final interrogation session and sought the aid of counsel, he vividly demonstrated an understanding of his predicament and of his constitutional rights. Neither *Doyle* nor *Wainwright* explicitly considers this problem. Defendant argues that the implicit assurance given by the *Miranda* warnings proscribes any evidentiary use of or comment upon defendant's invocation of *Miranda* rights, even when offered to rebut defendant's contention that he did not understand his rights. We

do not believe that either *Doyle* or *Wainwright* forbids the evidentiary use made in the present case.

The use of confessions for impeachment provides a helpful analogy. The state is forbidden to make direct use of a voluntary confession taken in violation of *Miranda*. However, the state may use such a confession to impeach a defendant who takes the stand. *State v. Walker*, 138 Ariz. 491, 495, 675 P.2d 1310, 1314 (1984). The rationale is that defendant may not use the fifth amendment as both a sword for exercise of his right to remain silent and a shield to permit perjured testimony. *Id.* More importantly, *Miranda* is a procedural rule, not a constitutional principle. *Oregon v. Elstad*, 470 U.S. 298, 307, 105 S.Ct. 1285, 1291–92, 84 L.Ed.2d 222 (1985). A defendant who may benefit from the *Miranda* principle should not be allowed to testify "free from confrontation" with the facts contained in his prior statements. *Harris v. New York*, 401 U.S. 222, 225 n. 2, 91 S.Ct. 643, 645 n. 2, 28 L.Ed.2d 1 (1971).

By informing a suspect of the *Miranda* rights, the state makes an implied promise that there will be no penalties if the suspect uses those rights. *Doyle, supra.* Thus, the state may not show invocation of the rights on issues of guilt, sanity, or competency. *Wainwright, supra.* However, we believe there are limits on how far an accused may stretch the *Wainwright* principle. It strains reality to hold that a defendant may invoke *Miranda* to stop further questioning and later freely argue that contemporaneous admissions were involuntary because he could not assert his *Miranda* rights. We do not "penalize" defendant for exercising his *Miranda* rights. We do not believe the implicit promise of freedom from penalty recognized in *Doyle* and *Wainwright* embraces the concept that defendant may simultaneously claim his rights and, without fear of contradiction, claim that he did not understand the rights he claimed.[7] We hold that evidence of ex-

---

6. TT, Dec. 18, 1985, at 86.

7. It would be required, of course, to give the jury a limiting instruction on the use to which the evidence of invocation may properly be put.

See *Readenour v. Marion Power Shovel*, 149 Ariz. 442, 450, 719 P.2d 1058, 1066 (1986). No such instruction was given here, nor was one requested. Whether the failure to give such

ercise of *Miranda* rights was admissible on the question of comprehension of those rights.

## B. ADMISSIBILITY OF THE CONFESSIONS

### 1. *Method of Obtaining*

One of the most difficult aspects of this case is the manner in which the state obtained the confession from Carrillo. He argues that the ruse used by the police to get him to the interrogation, the circumstances of the interrogation, and his own mental defects both violated *Miranda* and made his incriminating statements involuntary.

Before the questioning of December 20, 1984, Detective Gonzales had only slim circumstantial clues connecting Carrillo with the crime. The detective knew of defendant's relationship with Johnson, was informed about Carrillo's prior criminal record, was aware of indications of low intellect, and suspected that Carrillo may have been at Johnson's home about the time when the killer stabbed Johnson. The police had relatively little except these circumstances upon which to build a case against Carrillo, but they had no other viable suspects.

It is at this juncture that the police became creative. Detective Gonzales used an outstanding misdemeanor traffic warrant to make contact with the intellectually-stunted defendant. He and another officer entered the defendant's home on this basis and confronted him with the warrant. Carrillo, surprised because he rarely drove, denied any responsibility for the alleged traffic offense. The police invited Carrillo to take a trip downtown to clear up the matter. They did not formally arrest the defendant, although they placed him in the back of the police car and drove him the few blocks to the police station. Their intent is shown by the record:

Q. You and Detective Lowe essentially asked Mr. Carrillo to go with you down to the police department, is that right?

A. [DETECTIVE GONZALES] Yes, sir.

\*　\*　\*　\*　\*　\*

Q. That [traffic warrant] was if not an out and out rouse [sic] to get him to go, it was an excuse to get him to go; is that correct?

A. I viewed it as a tool to get him to go to the police department, yes, sir.[8]

\*　\*　\*　\*　\*　\*

Q. [W]hy did you feel that you had to take him down to ... the police department as opposed to talking to him after he invited you into the apartment?

A. [DETECTIVE GONZALES] Okay. I didn't know whether the Hector Carrillo who lived at 733 South Stone was the killer of Bruce Johnson or not. If he was, he knew it. I didn't. I was at a disadvantage. I felt by taking him from his house to the police department—and *he went voluntarily, I had no other way, if he had said, I don't want to, I couldn't have brought him down to the station,* I felt by taking him from there into my environment it helped my advantage out a little bit.

Q. In fact it was a game move, your ballpark type of thing?

A. You better believe it was.[9]

limiting instructions is fundamental error depends upon the facts of each case. *State v. Tamplin,* 146 Ariz. 377, 379, 706 P.2d 389, 391 (App.1985). We do not deem the failure to request such an instruction fundamental error where, as here, every explicit reference to de-

fendant's rights invocation was made and used in the correct analytical context.

**8.** TT, Dec. 12, 1985, at 64.

**9.** TT, Sept. 10, 1985, at 56 (emphasis added).

Once at the station house, the police treated Carrillo somewhat like an arrestee. Police technicians fingerprinted and photographed him, apparently without objection by Carrillo, but also without asking for permission or cooperation.[10] The detectives then placed the defendant in a small, windowless interrogation room furnished solely with three chairs and a table. This was all part of an environment specifically designed to help procure information from a suspect.

Finally, the detailed but unrecorded questioning began. Two police officers faced a solitary, retarded defendant who still had not been told the real reason he was at the police station. Without giving defendant the *Miranda* warnings, Detective Gonzales started with a discussion about the supposed traffic violation and then worked into the more sensitive area of Carrillo's criminal history. The detective established several links between the defendant and the victim. Carrillo filled in a few details about Johnson's home and car. Then Detective Gonzales, out of the blue, asked Carrillo if he killed Bruce Johnson. Carrillo responded that he only stabbed Johnson, but did not kill him. Realizing that he had his man, Detective Gonzales then turned on his tape recorder and began the unenviable task of explaining the *Miranda* rights to a person of limited intellect. Of course, by then the "cat was out of the bag." Defendant was explained his rights only after he had first inculpated himself by telling the police he had stabbed Johnson. All of these circumstances do call into reasonable question both compliance with *Miranda* and the voluntariness of Carrillo's incriminating statements.

### 2. *Compliance with Miranda*

Defendant's first admission that he had stabbed Johnson was made before his *Miranda* rights had been administered. Defendant claims that this statement should not have been admitted because it was the product of a custodial interrogation conducted prior to *Miranda* warnings. Defendant also argues that the court should have suppressed the statements made after the *Miranda* rights were explained because the later statements were the product of the improper pre-warning interrogation. *Wong Sun v. United States*, 371 U.S. 471, 487–88, 83 S.Ct. 407, 417, 9 L.Ed. 2d 441 (1963). Assuming, *arguendo*, the latter argument is correct,[11] we begin with the question of whether the police were obligated to give defendant his *Miranda* rights at the start of the first interrogation, before he admitted to having stabbed Johnson.

■ The police did not need to provide the *Miranda* warnings until Carrillo was in custody. *State v. Perea*, 142 Ariz. 352, 354, 690 P.2d 71, 73 (1984). Interrogation at the police station is not necessarily custodial. The question is really whether Carrillo's freedom was sufficiently constrained to put him in a custodial status before he incriminated himself. *State v. Cruz–Mata*, 138 Ariz. 370, 373, 674 P.2d 1368, 1371 (1983) (interrogation at station is non-custodial so long as there is no " 'formal arrest or restraint of freedom of movement' of the degree associated with a formal arrest," citing *California v. Beheler*, 463 U.S. 1121, 1126, 103 S.Ct. 3517, 3520 (1983)). The fact that the police procured defendant's cooperation and presence by using a ruse does not necessarily change the interrogation from non-custodial to custodial in nature. *Id.* at 1125, 103 S.Ct. at 3519, citing *Oregon v. Mathiason*, 429 U.S.

**10.** The surreptitious fingerprint comparison disclosed the fact that Carrillo's fingerprints did not match any of the latent prints found at the murder scene.

**11.** The principle is somewhat dubious. *See Elstad, supra,* holding that *Wong Sun* does not apply to *Miranda* violations. Of course, there are marked factual differences between this case and *Elstad.* In the case before us, the unwarned statement and the warned statement were essentially contemporaneous—much more of the "cat is out of the bag" situation. If *Elstad* applied to facts like these, the authorities would never need to give *Miranda* warnings before attempting an initial, custodial interrogation. Moreover, in *Elstad* the police had a valid felony arrest warrant when they went to the suspect's home. Elstad was in custody from the point of initial contact throughout his interrogations. 470 U.S. at 300–01, 105 S.Ct. at 1289.

492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977); *Cruz–Mata*, 138 Ariz. at 373, 674 P.2d at 1371.

Thus, in determining whether an interrogation was custodial so that *Miranda* warnings were required, "the focus is not whether a defendant felt he or she was in custody." The question is whether there were objective indicia of custody. *Id.* Here, as in *Cruz–Mata*, the interrogation occurred in the police station, but unlike *Cruz–Mata*, defendant was fingerprinted and photographed. However, he was not booked, nor was he told that the reason for the fingerprinting. Most importantly, in the case before us defendant was expressly told he was not under arrest. Actually, the police had no grounds for arrest and knew they could not hold defendant. As in *State v. Carter*, 145 Ariz. 101, 700 P.2d 488 (1985), defendant was not handcuffed, threatened nor compelled to go to the station. Guns were not drawn and neither defendant nor his residence was searched. *Id.*

■■■ Given these facts, the express disavowal of arrest, the assurance that Carrillo *did* not have to go to the station and the relatively short period of interrogation,[12] we cannot say that the trial court abused its discretion in finding from objective factors that the interrogation was non-custodial. *Cruz–Mata*, 138 Ariz. at 373, 674 P.2d at 1371. We cannot say, as a matter of law, that a reasonable person in such

circumstances would have concluded that he was in custody, despite being told that he was not. *State v. Carter*, 145 Ariz. at 105, 700 P.2d 488, 492 (1985). Given his diminished mental capacity, it may be that Carrillo's subjective perception was to the contrary, but we deal with objective criteria only in determining whether the interrogation was custodial. *See Lowe v. United States*, 407 F.2d 1391, 1397 (9th Cir.1969).

### 3. *Voluntariness—Waiver*

■ Defendant first argues that he did not make a knowing and intelligent waiver of his *Miranda* rights. Because of his low intelligence and poor linguistic ability, defendant claims he was incapable of understanding his rights and therefore could not waive them. The first problem with defendant's proposition is that there was evidence from the interrogating officer indicating defendant had actually understood his rights.[13] There was evidence to the same effect from the police psychologist, based in part on defendant's actual exercise of his constitutional rights. Based on this and other psychiatric evidence,[14] the trial judge found that Carrillo's waiver actually had been knowing and intelligent. On this record, we cannot disturb his ruling. *State v. Adams*, 145 Ariz. 566, 570, 703 P.2d at 514; *State v. Clabourne*, 142 Ariz. 335, 342, 690 P.2d 54, 61 (1984).

■ Defendant next argues that his waiver was compelled and therefore not voluntary. There is undisputed evidence

---

12. Interrogation lasted ninety minutes, well within reasonable bounds. *See Cruz–Mata*, 138 Ariz. at 372, 674 P.2d at 1370.

13. *See* TT, Sept. 10, 1985, at 43–45; TT, Dec. 11, 1985, at 142–44; TT, Dec. 12, 1985, at 77–78.

14. There was persuasive evidence in the report of Dr. Jose M. Santiago, a well qualified psychiatrist, who examined Carrillo on the question of the latter's competency to stand trial. *See* Rule 11, Ariz.R.Crim.P., 17 A.R.S. Dr. Santiago had treated Carrillo at various times during an eight-year period preceding the incident in question, and was the only person to question Carrillo in Spanish, his native language and the one in which he is most fluent. Dr. Santiago's report was considered by the trial judge in connection with the *Miranda* issues. *See* Rule 104(a), Ariz. R.Evid., 17A A.R.S. Dr. Santiago believed that Carrillo suffered from mild mental retardation,

was "undersocialized"—the system having given up on him too early, and aggressive. Dr. Santiago also believed that Carrillo was non-psychotic and competent to stand trial. He concluded that Carrillo was able to understand and answer "the questions freely, not agreeing when something is suggested that he considers not to be true, and questioning the interviewer when he does not understand a ... particular question." In his conclusions, Dr. Santiago commented that Carrillo was "cautious, and appropriately so, when any area could be selfincriminatory. He clearly demonstrated that he knew which area was sensitive for his trial and which area wasn't. He was very free and open ... on all areas that had no bearing on the ultimate outcome, and was guarded in the other areas." These findings weigh heavily on the question of capacity to understand and waive *Miranda* rights and also on some other issues involving voluntariness. *See infra.*

that defendant had a subnormal *subjective* capacity to appreciate and evaluate whether to choose to exercise or waive his rights. We do not believe that necessarily changes the result. The Constitution protects citizens against improper governmental action. So long as defendant's waiver of *Miranda* was truly cognitive, the test for compulsion is based upon an objective evaluation of the police officer's conduct. *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed. 2d 473 (1986).[15] "The sole concern of the fifth amendment, on which Miranda was based, is governmental coercion." *Id.* at ——, 107 S.Ct. at 523. Thus, the "voluntariness of a waiver ... has always depended on the absence of police overreaching" and not upon a metaphysical inquiry into defendant's "free will" or subjective perceptions of reality. *Id.*

Of course, what is police "overreaching" must depend in part on what the police know about the defendant. Certainly, the police cannot be allowed to handle a suspect having Carrillo's obvious impediments with the same methods that might legitimately be employed on a suspect of greater intellect and sophistication. Thus, even assuming that the definition of police overreaching may depend to some degree upon defendant's capacity to understand the proceedings, the record here indicates that the police made every attempt to explain the defendant's rights in an understandable, simplified fashion. The detective did this because he was concerned that the explanation be given in a manner that Carrillo could understand. The fact that defendant invoked his rights is persuasive evidence that the detective made an adequate explanation. The record indicates an appropriate concern that defendant understand his rights.

Q. The other rights you took your time to explain one at a time as if talking to a child, would you say that's a fair characterization?

A. I modified them.

Q. You broke them down so he could understand them?

A. Yes, that's correct.

Q. And you knew at the time you were dealing with someone who at least from your information was mildly or moderately retarded?

A. Yes, sir.[16]

We conclude, therefore, that even given defendant's mental shortcomings, the conduct of the police, objectively viewed, was not an example of overreaching by the state. In this sense, given the cognitive predicate found by the trial court, defendant's waiver of his rights was voluntary and consistent with the requirements of *Miranda.*

### 4. Voluntariness—The Totality of the Circumstances

Even though Carrillo properly received his *Miranda* warnings and waived his constitutional rights, the confessions would still be inadmissible if, by dint of the entire process, the police had overwhelmed his will and thus extracted the confessions involuntarily. We assess the totality of circumstances in the present case, *State v. Tison*, 129 Ariz. 526, 537, 633 P.2d 335, 346 (1981), *cert. denied*, 459 U.S. 882, 103 S.Ct. 180, 74 L.Ed.2d 147 (1982). In doing so, we acknowledge the low intelligence of the accused, *State v. Drury*, 110 Ariz. 447, 455, 520 P.2d 495, 503 (1974); the arguably coercive environment of the police interrogation room, *Cruz–Mata*, 138 Ariz. at 373, 674 P.2d at 1371; the clear focus of the investigation on the defendant, *Perea*, 142 Ariz. at 355, 690 P.2d at 74; the fingerprinting and police transportation to the station, *State v. Riffle*, 131 Ariz. 65, 67, 638 P.2d 732, 734 (App.1981); and the initial police deception used to induce defendant to go to the police station. *State v. Denny*, 27 Ariz.App. 354, 555 P.2d 111 (1976).

On the other hand, we note Carrillo's prior extensive contacts with the law en-

---

**15.** The exact meaning of *Connelly* is currently the subject of heated debate in the lower federal courts. *See, e.g., United States v. Wolf*, 813 F.2d 970, 975–76 n. 16 (9th Cir.1987). We interpret *Connelly* to mean that an effective waiver must be both *cognitive* and free from compulsion.

Defendant must have understood his rights, intended to waive them and the decision must not have been compelled by governmental impropriety.

**16.** TT, Dec. 12, 1985, at 78.

forcement system, the patient explanation of the *Miranda* rights, and the manner in which he invoked his constitutional rights to stop the final interrogation. Moreover, the three interrogations apparently lasted only ninety minutes total. The police made no threats or promises to Carrillo, who seemed willing to cooperate. *State v. Ferguson,* 149 Ariz. 200, 207–08, 717 P.2d 879, 886–87 (1986). Nor can it be said that the ruse that got Carrillo to the station actually caused the confession. *State v. Winters,* 27 Ariz.App. 508, 511, 556 P.2d 809, 814 (1976). He may well have confessed at home, if interrogated there.

Defendant claims his mental abilities affect the constitutional equation. We agree, although defendant's subjective "perception of coercion" resulting from his hidden mental confusion or delusion is a "matter to which the United States Constitution does not speak." *Connelly,* 479 U.S. at ——, 107 S.Ct. at 524. However, *Connelly* also emphasizes that the confession "must have been voluntary in the sense that it was [not] the product of ... intimidation, coercion or deception...." *Id.* at ——, 107 S.Ct. at 523, quoting from *Fare v. Michael C.,* 442 U.S. 707, 726–27, 99 S.Ct. 2560, 2572–73, 61 L.Ed.2d 197 (1979) (even for juvenile suspects, totality of circumstances test adequate to determine waiver of *Miranda* rights). Viewing this record as a whole, and making an objective evaluation of the conduct of the police, we find no objective evidence that the police conduct was either intimidating or coercive.

There is, of course, evidence of "deception." The police employed a ruse to get defendant to the police station, and then, after some marginally relevant questioning, surprised defendant with the key question. Was this the type of deception proscribed by *Connelly?* If we apply *Connelly*'s objective test, we must hold that the deception used in this case is not the type of police overreaching forbidden by the Constitution. Surely the Constitution does not require the police to give every person being questioned a complete exposition of the reason for questioning, the objectives sought, the evidence already in hand, and the strength of the case being built. *See,*

*e.g., Cruz–Mata,* 138 Ariz. at 372, 674 P.2d at 1370; *State v. Williams,* 434 So.2d 967 (Fla.Dist.Ct.App.1983) (police deception which induced murder suspect to accompany homicide detectives to station for interrogation did not require suppression of consequent post-*Miranda* warnings confession).

The very nature of law enforcement encourages police to use some artifice and trickery in their work. *See, e.g.,* Note, *Police Use of Trickery as an Interrogation Technique,* 32 VAND.L.REV. 1167 (1979); White, *Police Trickery in Inducing Confessions,* 127 U.PA.L.REV. 581 (1979). *Miranda* curtailed many of the most egregious practices, such as the infamous "third degree." However, courts still tolerate some police gamesmanship, so long as the games do not overcome a suspect's will and induce a confession not truly voluntary. *See Winters, supra* (under circumstances of the interrogation, defendant's will was not overborne by false police statement that defendant's fingerprints had been found at the scene of the crime). *See generally* Abney, *Mutt and Jeff Meet the Constitution: The Propriety of Good Guy/Bad Guy Interrogation,* 22 CRIM.L.BUL. 118 (Mar.–Apr.1986).

On the other hand, we do not believe *Connelly* forbids consideration of the accused's subjective mental state. Certainly the police are not permitted to take advantage of the impoverished, the mentally deficient, the young, or the inexperienced by employing artifices or techniques that destroy the will of the weakest but leave the strong, the tough, and the experienced untouched. The police are not forbidden to outsmart—they are forbidden to compel. The problem here is to find a tolerable level of conduct when the suspect is arguably not a competent opponent for the police. It would be bad law to hold that the police may prey upon the weak, and equally bad law to hold that every type of mental deficiency will provide an effectively impentrable shield from ordinary police investigation.

 Under *Connelly,* the question of voluntariness is to be determined by an objective evaluation of police conduct and

mentationnotThe

not by defendant's subjective perception of reality. However, we believe that the objective evaluation of police conduct must take into consideration defendant's mental condition. In other words, the propriety of the investigative and interrogation techniques used must be judged in light of what the police knew or should have known about defendant's ability to comprehend the events and circumstances surrounding him or her. The police cannot treat an uneducated, retarded suspect in the same manner as they might treat a sophisticated businessman or professional suspected of white collar crime. Nor may a suspect who is obviously incoherent, nonresponsive, hysterical, or otherwise in visible distress be subjected to interrogation as if he or she were a normal adult obviously able to comprehend what is occurring. Thus, while *Connelly* directs us to an objective evaluation of police conduct, we believe that evaluation must be made in light of what the police should perceive from the objective manifestations of the suspect's physical or mental condition.

In the case before us, the record fails to establish the degree of overreaching required for us to hold that the confession obtained from defendant was involuntary. Of course, we have no way of knowing defendant's subjective understanding of the events, but neither objective evaluation of the police conduct nor Carrillo's reactions indicate that the confession obtained was compelled in the constitutional sense. This conclusion is supported, of course, by Dr. Santiago's findings. *See ante.*

Despite the methods used to get Carrillo to the station, the police carefully explained that Carrillo's presence there was voluntary and that he was not under arrest. Carrillo did not display objective signs of unusual mental distress or incomprehension. While the body is often an imperfect expression of the mind, we can only rely upon what is shown to the outside world. He cooperated without protest. When he felt the police had gone too far, he refused to cooperate. Under the *Connelly* test, there is support for a finding that despite his mental condition, Carrillo's confession was not compelled.

Based upon an analysis of the record and the applicable legal principles, we conclude that there are no legal grounds to set aside the trial judge's finding and the jury's determination that defendant intelligently, knowingly, and voluntarily waived his constitutional right to the aid of counsel and to refrain from incriminating himself, and that the resulting confession was voluntary. *State v. Tothill,* 120 Ariz. 406, 408, 586 P.2d 655, 657 (App.1977). Though the question is close, the record supports the finding that the police did not overreach and did not overwhelm and overbear defendant's will.

We affirm the judgment. We vacate those portions of the court of appeals' opinion that are inconsistent with this opinion.

GORDON, C.J., and CAMERON, HOLOHAN and MOELLER, JJ., concur.