762 P.2d 1318

**STATE of Arizona, Appellee,**

v.

**Alexsandro Vincente BRAVO,
Appellant.**

**No. CR–86–0015–AP.**

Supreme Court of Arizona,
En Banc.

Sept. 20, 1988.

Robert K. Corbin, Atty. Gen. by William J. Schafer III, Paul J. McMurdie, Asst. Attys. Gen., Phoenix, for appellee.

Curtis & Cunningham, by George H. Curtis, Tucson, for appellant.

MOELLER, Justice.

## JURISDICTION

A jury convicted defendant Alexsandro Vincente Bravo of the felony murder of Shang Ngor (Julie) Wong. The same jury, in a joint trial, also found Bravo guilty of armed robbery, aggravated robbery, and aggravated assault committed against Raland Tinker one day before the Wong murder. Defendant was sentenced to three concurrent twelve-year terms on the Tinker convictions and a consecutive term of life imprisonment without possibility of parole for twenty-five years on the Wong murder. He appeals directly to this court. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3); A.R.S. §§ 13–4031, –4033, –4035.

## ISSUES

The principal issues we deal with are:
(1) Whether all of defendant's in-custody statements to investigating officers should have been suppressed on grounds of involuntariness, or whether it was sufficient to suppress those portions taken after the officers continued their interrogation notwithstanding defendant's invocation of his right to remain silent?
(2) Whether the testimony of witness Danny Champion should have been suppressed as fruit of the poisonous tree?
(3) Whether the court properly excluded a hearsay statement of Reynaldo Tapia which tended to implicate a per-

son other than defendant in Wong's murder?

(4) Whether the testimony by a jail counselor and a psychiatrist on the issue of voluntariness violated defendant's rights because the testimony was based, in part, on defendant's exercise of his constitutional rights?

We affirm all of the trial court's rulings except that relating to the Champion testimony, which testimony must be suppressed because it was illegally obtained.

## FACTS

### A. The Tinker Robbery.

Because of the nature of the issues raised on appeal, we set forth the facts of these interrelated offenses in some detail. On December 12, 1981, Charles Craig's Colt .38 Special was stolen from Tucson's Desert Inn Hotel. Also stolen were some unusual Federal brand bullets which Craig used in the .38. The next evening, December 13, 1981, Raland Tinker left his room at the La Quinta Motel in Tucson and walked to his Chevy Blazer in the parking lot. Tinker put some items in the back of his Blazer and locked the back part of the Blazer. As he walked around the vehicle to get into the driver's seat, two men came out from between some cars parked nearby and approached him. The first man, holding a gun, said, "This is a holdup. I want your money, your wallet, and this is a real gun." The same man then approached Tinker with the gun held high, partially obscuring his face, and ordered Tinker to lie face down on the ground. Tinker, who was familiar with firearms, thought the gun was either a .32 or .38 caliber Colt. Tinker obeyed, laid down on his stomach, and removed his wallet from his back pocket and placed it near his head. The wallet contained some credit cards, a Washington state fishing license, and a hidden $50 bill. The second man, who Tinker never saw, checked Tinker's pockets. The first man then struck Tinker on the head with the gun; the gun discharged, sending a bullet into Tinker's midsection.

After the attack, Tinker was taken to a local hospital where he was treated. The bullet removed from his abdomen was preserved for evidence. Although Tinker was shown several photographic lineups by the police shortly after the crime, he was unable to identify the one attacker he had seen. None of the line-ups shown to Tinker contained a picture of the defendant. Tinker described his attacker as a Mexican or Hispanic male between 17 and 19 years old, standing 5'10" and weighing approximately 150 pounds.

### B. The Wong Murder.

At approximately 9:00 a.m. on December 14, 1981, the day after the assault and robbery of Tinker, an assailant entered the H & W Market near Tucson High School. The assailant shot and killed Wong, a sixty-seven year old woman who was one of the owners of the store. Police arriving on the scene found Wong, who had been shot through the left eye, laying on the floor near the front counter of the store. A television located in the back of the store was on, as was a sewing machine near it. The drawer to the cash register was open and contained only change. Later, during an autopsy, a bullet lodged in Wong's head was removed and preserved for evidence.

Police connected the Tinker and Wong crimes through ballistics analysis which revealed that the unusual bullets removed from the victims' bodies probably came from the same Colt .38 or .38 special revolver. Analysis also revealed that the fired bullets had characteristics similar to those which had been stolen from Charles Craig at the Tucson Inn. However, no matching gun was ever found.

### C. The Defendant's In–Custody Statements.

Nearly two and one-half years later, on April 4, 1984, defendant Bravo was arrested in Benson, Arizona, for attempting to steal a police car in broad daylight. He was incarcerated in the Cochise County jail in Bisbee. While being booked, he was extremely disoriented and it was impossible to communicate with him. As described by

one witness, he was "literally bouncing off the walls." Jail personnel observed Bravo banging his head against jail bars and walls and had to physically restrain him. He openly masturbated continuously, engaged in other public displays of sexual conduct, and asked other inmates for sexual favors.

The jail psychiatrist initially thought defendant's condition was due to acute drug intoxication and decided to let the defendant "dry out." However, defendant's condition did not improve. Therefore, eight days after his arrest, the jail psychiatrist placed defendant on Haldol, a powerful psychotropic medicine. He also prescribed Symmetrel to control the physical side effects of Haldol. The Haldol was administered to make defendant more manageable, to clear his thought processes, and to help defendant communicate. While defendant's behavior improved somewhat, jail personnel testified that he was still disoriented.

By April 17, 1984, after five days of medication, defendant's abnormal public sexual activity ceased. At approximately noon on that day, defendant asked a detention officer if he could use the jail phone. He made a phone call. Approximately two hours later, he asked to talk to a detention officer. An officer went to defendant's cell where, without any prompting from the officer, defendant told the officer that he had killed an old woman in an armed robbery in Tucson. The officer then asked defendant if he would like to speak to the jail counselor, Nancy Kirkman.

Defendant agreed to speak to Kirkman and was escorted to her office by two officers. According to Kirkman, defendant was nervous and visibly upset. Defendant told Kirkman that he had "lived with it" long enough and that he needed to confess to a crime. Kirkman told defendant that she had to call a police detective because she could not keep confessions in confidence. She then told defendant that if he desired she would summon a detective. Defendant said that is what he desired. Kirkman then summoned a detective to her office. Before the detective arrived, defendant again told Kirkman that he had murdered a lady in Tucson. While defendant and Kirkman waited for the detective's arrival, Kirkman advised defendant that he should consider exactly what he wanted to tell the detective because it could be used against him.

Detective Martinez, who was stationed in the same building, arrived a short time later and read defendant his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Kirkman was present during the reading of the *Miranda* rights and she attempted to explain the meaning of each of the rights to the defendant in terms he could understand. Kirkman took the time to explain the *Miranda* rights to defendant because her observation of his behavior led her to believe that he might be incapable of understanding his rights. Defendant acknowledged that he understood his rights by either nodding his head or saying "yes."

After Martinez finished reading defendant his rights, defendant became visibly upset and invoked his *Miranda* rights by saying, "I don't want to say anything now." Martinez honored defendant's invocation of rights and immediately left the room. However, the defendant shortly thereafter asked Kirkman to summon Martinez again, which she did. Kirkman, after observing defendant exercise his rights, came to believe that he did indeed understand them. When Martinez returned, he again informed defendant of his *Miranda* rights and Kirkman again explained the rights to defendant. Defendant again acknowledged that he understood his rights.

In an unrecorded conversation, defendant then told Martinez that he had shot an elderly lady, possibly in May 1982, near Tucson High. He thought the name of the store was the "C & W store." Defendant said he shot the lady with a .38 special because she attempted to stop his robbery of the store. Defendant first said he threw the .38 special into the Santa Cruz River and then said that he had sold it. Martinez then contacted the Tucson Police Department which dispatched homicide Detectives

Perry Lowe and Edward Gonzales to Bisbee to talk with defendant.

Lowe and Gonzales, who were introduced to defendant as members of the Tucson Police Department, conducted a tape-recorded interview of the defendant. Lowe and Gonzales interrogated the defendant at length. The resulting statements by the defendant are at the heart of three of the four principal issues in this appeal. Early in the interrogation, defendant implicated himself in both the Wong murder and the theft of the gun from the Desert Inn.

However, after making those incriminating statements, defendant invoked his right to remain silent by stating, "Well, I don't wanna answer any more questions." The two officers nevertheless continued the interrogation although defendant again immediately asserted that he wanted "no more questions." Detective Lowe later explained his reasons for continuing the questioning as follows:

Q. (By Mr. Unklesbay): Is it also true that you continued to ask him questions after that (defendant's invocation of rights)?

A. It is true.

Q. All right. Did you—did you and Detective Gonzales as well?

A. Yes.

Q. Is there some reason you had for asking those questions of Alex Bravo after he said that he did not want to answer any more questions?

\* \* \* \* \* \*

THE WITNESS (Officer Lowe): Basically, the reason I continued was the brief information that I had received from Mr. Bravo didn't satisfy me that he wasn't lying or making up the story. And to either clear him as well as anything, I felt I had to talk to him to see if he was fabricating the story.

As I recall the statement, he just said things like "I did it," and didn't get into any detail that couldn't have been figured out by other—other people that were around the area, either by the news or had been in the store before.

And by continuing the questioning— and it didn't appear as if he was object-

ing strenuously—that I could straighten that out, which I believe I did.

On cross-examination by defense counsel, Officer Lowe elaborated:

Q. (By Mr. Curtis): ... you're aware of the Miranda decision, aren't you?

A. Yes, I am.

Q. And you're aware that when a person that you're questioning asks that he not answer any more questions, that it's your duty to stop the interview; is that correct?

A. I have been aware of the Miranda decision and the different rulings from different courts and which is admissible and which is not admissible and when it can be used and when it can't be used.

And I believe—if I believe that I'm trying to protect everyone's rights and find out what is the truth, I let the judge make that decision.

Q. And at that point you decided not to honor—you specifically decided, did you not, not to honor his request to stop the interview, correct?

A. I didn't believe when he said "I don't want to answer any more questions," or whatever the exact words were at that particular time, that it meant about everything. It may have been about that particular thing I asked him before.

Q. And so, in—after two more questions when he said it again that he didn't want to answer any more—any more questions, you continued to question him, correct?

A. I don't remember the sequence.

At another pretrial hearing, Officer Lowe explained his theory of continuing to question Bravo after he invoked his *Miranda* rights thusly:

I didn't feel at that particular point there was enough facts to indicate whether he was telling me the absolute truth or not.

I wanted to hear from him some other thing that would verify or refute what he had to say. If he came up with some entirely different thing that couldn't have been happening, I would have said

this wasn't the man. And I needed to get a little more information, I felt. So, I went on and talked to him.

I didn't really think he wanted to terminate it as—just seemed like he just wanted to get off that particular subject at that time.

### D. The Witness Danny Champion.

It was only during the interrogation which occurred after defendant invoked his rights that he directly incriminated himself in the La Quinta robbery of Tinker and disclosed the existence of the witness Champion. After acquiring Champion's name from defendant, Detective Lowe went to Champion's home in Tucson within the next few days. Champion was not home. Lowe left his business card and requested that Champion come to the police station. On May 2, 1984, Champion did come to the police station and was interviewed by Lowe and Gonzales. Although most of the interview was recorded, the first five or ten minutes were not recorded. During that brief period, the detectives and Champion made a deal. The detectives told Champion that they were aware of his participation in the robbery of Tinker at the La Quinta, but that if he would testify against defendant they would not charge him with the La Quinta robbery, so long as he was not the shooter. The detectives also agreed to help Champion out on some unrelated marijuana charges. At trial, Lowe and Gonzales denied Champion's claim that they threatened to "bust his ass" if he failed to cooperate.

At the initial interview with Lowe and Gonzales, Champion denied that defendant had ever told him he had shot and killed someone else. However, after the interview, Champion consulted with counsel. Counsel, in turn, recontacted the detectives and, in a statement two weeks after the first one, Champion claimed that he had heard the defendant confess the Wong murder in the presence of one Jerry Galvan.

At trial, Champion provided damning evidence against defendant on both the Tinker and Wong charges. Regarding Tinker, he testified that he and defendant robbed him on December 13, 1981, because defendant just decided to rob someone that day. Champion, armed with a .22, said he accompanied defendant, who carried a .38 Smith & Wesson, over to the La Quinta Inn. Champion stated that they saw a man leave his hotel room and walk out to his truck. According to Champion, Bravo approached the man and forced him to lay on the ground. Champion identified Tinker as the man whom he and Bravo had robbed. Champion claimed that when the defendant attempted to strike Tinker on the head with his gun, he, Champion, the good samaritan, tried to stop defendant by putting his arm between the gun and Tinker's head, but that the gun went off. Champion said that the wallet contained no money, some credit cards and a fishing license from Washington. On the Wong murder charge, Champion testified that he had heard defendant confess the Wong murder to Jerry Galvan.

### VOLUNTARINESS OF DEFENDANT'S STATEMENTS

Before trial, defendant moved to suppress all of his April 17 Cochise County jail statements as involuntary. The trial court suppressed only the portion of his taped statement made after defendant invoked his *Miranda* rights. The state did not object to that suppression order at trial and does not here. The trial court refused to suppress the other statements, finding that they were voluntary. Basically, defendant contends that his statements and his initial waiver of *Miranda* rights were involuntary by reason of his mental condition and the effect of the medication he was taking. The trial court held an extensive evidentiary hearing and found the statements and the waiver to be voluntary.[1]

The expert witnesses at the suppression hearing all agreed that defendant suffered from a mental illness, although they did not agree upon the nature of the illness or

---

1. In a later section of this opinion, we deal with the propriety of permitting testimony at the

suppression hearing to be based, in part, on defendant's invocation of constitutional rights.

its effect upon defendant's ability to appreciate his constitutional rights. Some experts testified that the Haldol defendant was taking improved his ability to think by slowing his otherwise confused thought processes.

After carefully considering all the evidence, the trial court found the statements to be voluntary. In doing so, the trial court relied heavily on its own evaluation of the taped statement and placed little weight on defendant's involuntary movements during the interview, finding that those movements were a side effect of Haldol not affecting defendant's ability to understand the questions. In accordance with *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), the issue of voluntariness was also submitted to the jury following the trial court's pretrial preliminary determination.

■ Confessions are prima facie involuntary and the state must show by a preponderance of the evidence that a confession was freely and voluntarily given. *State v. Thomas,* 148 Ariz. 225, 714 P.2d 395 (1986). Mental illness alone will not preclude the admission of an otherwise voluntary confession unless the illness renders the declarant unable to understand the meaning of the statements made. *State v. Porter,* 122 Ariz. 453, 456, 595 P.2d 998, 1001 (1979). Once the trial court has properly considered all the circumstances surrounding an interrogation, the trial court's determination that a confession was voluntary will not be disturbed on appeal absent clear and manifest error. *State v. Graham,* 135 Ariz. 209, 211, 660 P.2d 460, 462 (1983).

In evaluating defendant's present claim, the recent Supreme Court case of *Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), is most instructive. Connelly approached a police officer in downtown Denver and announced that he had murdered someone. The officer immediately advised him of his *Miranda* rights, but Connelly confessed anyway "because

his conscience had been bothering him." Connelly proceeded to provide details of the homicide to several officers in a coherent fashion, enabling the officers to link Connelly's confession to a previously unsolved murder. The following night, while in custody, Connelly became disoriented, began hearing voices, and stated that the voices had directed him to confess. He was initially found incompetent to stand trial, but was found competent in an evaluation conducted several months later.

At a suppression hearing, a psychiatrist described Connelly as suffering from chronic schizophrenia and as being in a psychotic state the day he confessed. The trial court suppressed the confession as involuntary. The Colorado Supreme Court affirmed, stating that "the ultimate test of voluntariness is whether the statement was the product of a rational intellect and a free will." *People v. Connelly,* 702 P.2d 722, 728 (Colo.1985).

The United States Supreme Court reversed. According to the Court, the Supreme Court of Colorado failed to recognize "the essential link between coercive activity of the State, on the one hand, and a resulting confession by a defendant, on the other." 479 U.S. at 165, 107 S.Ct. at 521, 93 L.Ed.2d at 483. The Court specifically rejected an inquiry into a defendant's motivation for speaking or acting as he did when the defendant does not claim that governmental conduct coerced the confession. The Court squarely held "that coercive police activity is a necessary predicate to the finding that a 'confession' is not voluntary within the meaning of the Due Process Clause of the Fourteenth Amendment." 479 U.S. at 167, 107 S.Ct. at 522, 93 L.Ed.2d at 484.[2]

■ In the instant case, there is absolutely nothing in the record demonstrating any coercive police tactics insofar as the unsuppressed statements are concerned. *See also State v. Carrillo,* 156 Ariz. 125, 134–137, 750 P.2d 883, 892–95 (1988) (following *Connelly* ).

**2.** The defendant here has asserted only federal constitutional grounds in support of his suppression argument.

Nor can defendant prevail by claiming that his waiver of *Miranda* was involuntary. In *Connelly* the Supreme Court rejected the same argument:

> There is obviously no reason to require more in the way of a "voluntariness" inquiry in the *Miranda* waiver context than in the Fourteenth Amendment confession context. The sole concern of the Fifth Amendment on which *Miranda* was based, is governmental coercion.... The voluntariness of a waiver of this privilege has always depended on the absence of police overreaching, not on free choice in any broader sense of the word....

479 U.S. at 169–70, 107 S.Ct. at 523, 93 L.Ed.2d at 486.

Despite the similarities between *Connelly* and this case, there is one significant difference. In this case, defendant alleges that the state's decision to treat him with a powerful psychotropic medicine rendered his statements involuntary. The power of Haldol is undisputed, and there is a potential for abuse of medications in questioning prisoners. However, it is clear that in this case, the medication was prescribed for wholly legitimate purposes. Neither the jailers nor the doctor prescribing the Haldol had any idea at all that defendant may have been involved in serious crimes unrelated to the relatively minor one for which he was in custody. No questioning was even contemplated.

The Haldol was prescribed for a proper purpose and it did not, in fact, produce either an involuntary confession or an involuntary *Miranda* waiver. Jails and prisons must necessarily provide proper medical treatment for prisoners. Indeed, statements obtained from prisoners deprived of proper medical treatment may sometimes be considered coercive. *See Greenwald v. Wisconsin*, 390 U.S. 519, 522, 88 S.Ct. 1152, 1154, 20 L.Ed.2d 77, 79 (1968) (suspect's statements involuntary in part because he was interrogated without access to his high blood pressure medication); *Sloan v. Estelle*, 710 F.2d 229, 232–33 (5th Cir.1983), *cert. denied*, 464 U.S. 1048, 104 S.Ct. 724, 79 L.Ed.2d 185 (1984) (defendant unsuc-

cessfully argued that confession was coerced because he was denied access to his medication for bronchial asthma).

Our previous case law has held that if a defendant was so intoxicated that he could not understand the meaning of his statements, then the statements were involuntary. *State v. Laffoon*, 125 Ariz. 484, 487, 610 P.2d 1045, 1048 (1980). In *State v. Clabourne*, we held that the test for voluntariness when a defendant is under the influence of narcotics or mental disabilities is whether the condition renders him unable to understand the meaning of his statement. 142 Ariz. 335, 342, 690 P.2d 54, 61 (1984). The trial court looks to the totality of the circumstances to determine whether the accused was able to reason, comprehend, or resist. *State v. Laffoon*, 125 Ariz. at 487, 610 P.2d at 1048. However, after *Connelly* and *Carrillo*, the question of voluntariness, for purposes of the federal constitution, must focus on police conduct, and not solely on the mental state of the defendant. *State v. Tucker*, 157 Ariz. 433, 445, 759 P.2d 579, 591 (1988) (finding that an intoxicated defendant's statements were voluntary within the meaning of the due process clause of the fourteenth amendment and were not obtained in violation of his fifth amendment rights).

Like the trial court, we have listened to the taped portions of the statements and have reviewed all of the other evidence which was before the trial court on the issue of voluntariness. There is ample evidence to support the trial court's finding.

## ADMISSIBILITY OF CHAMPION'S TESTIMONY

We have previously set forth at some length the circumstances concerning the continued interrogation of defendant after he invoked his *Miranda* rights. It was during this interrogation that the officers first learned of the witness Champion who had not surfaced as a witness in the two and one-half years since the La Quinta robbery and the Wong murder. The detectives immediately attempted to contact Champion. When they did so, they made a

deal with him by which he would testify against defendant on the La Quinta robbery in return for immunity on the La Quinta crimes and "help" on some other unrelated offenses. Upon further reflection and after consulting with an attorney, Champion also provided the police with evidence of defendant's purported confession to the Wong murder as well, although he denied any such knowledge at the time of his first interview with the police.

Defendant moved to exclude Champion's testimony as "fruit of the poisonous tree," pursuant to *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The issue is whether "the connection between the lawless conduct of the police and the discovery of the challenged evidence has 'become so attenuated as to dissipate the taint' " of the violation. *Id.* at 487, 83 S.Ct. at 417, 9 L.Ed.2d at 457.

The critical case in the resolution of this issue is *United States v. Ceccolini,* 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978). In *Ceccolini* a policeman on his lunch break visited a flower shop and began conversing with an employee who was also his friend. During the conversation, the officer noticed an envelope and, after examining the envelope, discovered evidence of a gambling operation. The officer asked the employee who owned the envelope. The employee told the officer that the envelope belonged to Ceccolini.

Coincidentally, the FBI had been conducting an ongoing investigation into gambling in the area and the flower shop had been under surveillance for some time. As a result, the identity of Ceccolini and the employee were already known to the FBI. The officer's supervisor notified the FBI. Four months later, the FBI interviewed the employee. The employee told the agent that she was studying police science in college and was willing to testify against Ceccolini. She did and Ceccolini was convicted of perjury. He challenged the admissibility of her testimony on the grounds that it was the fruit of an illegal search.

The Supreme Court held that the employee's testimony was properly admitted despite the causal connection between the illegal search and the testimony. The Court went beyond the preexisting "independent source" and "inevitable discovery" exceptions to the exclusionary rule in order to admit the testimony. The Court also distinguished between physical evidence and live witnesses:

> Witnesses are not like guns or documents which remain hidden from view until one turns over a sofa or opens a filing cabinet. Witnesses can, and often do, come forward and offer evidence entirely of their own volition. And evaluated properly, the degree of free will necessary to dissipate the taint will very likely be found more often in the case of live-witness testimony than other kinds of evidence. The time, place and manner of initial questioning of the witness may be such that any statements are truly the product of detached reflection and desire to be cooperative on the part of the witness. And the illegality which led to the discovery of the witness very often will not play any meaningful part in the witness' willingness to testify.

*Id.* at 276–77, 98 S.Ct. at 1060, 55 L.Ed.2d at 277.

Additionally, the Court noted that there can be great injury to the public when an eligible witness is precluded from testifying. "Rules which disqualify knowledgeable witnesses from testifying at trial are ... 'serious obstructions to the ascertainment of truth'...." *Id.* at 277, 98 S.Ct. at 1061, 55 L.Ed.2d at 278 (citing C. McCormick, *Law of Evidence* § 71 (1954)).

In *Ceccolini* the Court concluded that the following factors militated toward admitting the employee's testimony: the witness' willingness to testify, the time lapse between the illegal search and the initial contact with the witness' the subsequent time lapse between the contact with the witness and the witness' testimony, the independent and preexisting surveillance of the flower shop by the FBI, and the absence of any intent by the officer to find evidence of an illegal gambling operation. 435 U.S. at 279–80, 98 S.Ct. at 1062, 55 L.Ed.2d at 279.

The principles of *Ceccolini* have evolved into a four-factor test to be used to determine the admissibility of tainted live-witness testimony: (1) the willingness of the witness to testify; (2) the role played by the illegally seized evidence in gaining the witness' cooperation; (3) the proximity between the illegal behavior, the witness' decision to cooperate and the actual testimony at trial; and (4) the police motivation in conducting the search. *United States v. Hooton*, 662 F.2d 628, 632 (9th Cir.1981), *cert. denied* 455 U.S. 1004, 102 S.Ct. 1640, 71 L.Ed.2d 873 (1982) (citing *United States v. Leonardi*, 623 F.2d 746, 752 (2nd Cir.), *cert. denied*, 447 U.S. 928, 100 S.Ct. 3027, 65 L.Ed.2d 1123 (1980)).

In this case the trial court concluded that three of the four factors favored the state, and that the testimony of Champion was admissible. We disagree and hold that Champion's testimony must be excluded.

## A. Police Motivation

■ In weighing the factor of police motivation (to take the last factor first), we believe it is appropriate to look at the extent and nature of the violation. The illegality in *Ceccolini* was virtually accidental when compared to the violation in this case. The officers in this case were experienced homicide detectives from a large metropolitan police force. They were thoroughly familiar with *Miranda*. *Miranda* is clear:

> Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to *or during questioning*, that he wishes to remain silent, *the interrogation must cease*.

384 U.S. at 473–74, 86 S.Ct. at 1627, 16 L.Ed.2d at 722–23 (emphasis added.)

The suspect's right to cut off questioning must be "scrupulously honored." *State v. Hatton*, 116 Ariz. 142, 146, 568 P.2d 1040, 1044 (1977); *see also Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). The violation in this case did not occur in any murky, ill-defined area of law where reasonable persons could differ on *Miranda* application. This was a clear violation of black letter *Miranda* law known to all qualified police officers.

The excuses offered by the officers for continuing the questioning after the defendant invoked his rights are frivolous. If the United States Supreme Court had intended that in-custody interrogation of prisoners could be conducted and continued solely at the discretion of the interrogating officer, it would not have promulgated the *Miranda* rule. For the officers to contend that they may continue questioning after the defendant's invocation of rights for the purpose of trying to exonerate him is merely the flip side of their contending that they may continue questioning him to see whether his answers fail to exonerate him, i.e., to see whether his answers incriminate him.

Our review of the tape and of the transcript of defendant's interview with the detectives indisputably reveals that the police were actively searching for information and for witnesses. The following passage is but one example demonstrating the frivolity of the present claim that the officers were simply attempting to see whether defendant was falsely confessing to the Wong murder:

Lowe: ... Do you remember being over at La Quinta and robbing a man there?

Bravo: No. I didn't do that.

Lowe: You didn't do that.

Bravo: Uh-um.

Lowe: What if I told you the same gun tht [sic] was used in the La Quinta shooting was the same gun that shot the old lady?

Bravo: What's La Quinta? ....

Lowe: I'd kind of like to know about the night before you did this? [the murder]

....

Bravo: I don't remember. Why would I remember the night before?

Lowe: Because you should remember everything before or after. A time period that ...

Bravo: I guess I do.

Lowe: You think you do?

Bravo: Because I was in La Quinta, too. I did that, too.

Finally, the police obtained Danny Champion's name by asking a specific question which falls outside their purported rationale for continuing the interview after Bravo's invocation of his *Miranda* rights. When they asked defendant "[w]ho was with you [during the robbery]?" and elicited Danny Champion's name, they were not confirming anything, but were instead seeking new information.

The Supreme Court approved of the eyewitness testimony in *Ceccolini* in part because "[t]here is, in addition, not the slightest evidence to suggest that Biro [the officer] entered [the premises] ... with the intent of finding tangible evidence ... much less any suggestion that he entered the [premises] ... with the intent of finding a willing and knowledgeable witness...." 435 U.S. at 279–80, 98 S.Ct. at 1062, 55 L.Ed.2d at 279. Indeed, the *Ceccolini* decision stated: *"Of course, the analysis might be different where the search was conducted by the police for the specific purpose of discovering potential witnesses." Id.* at 276 n. 4, 98 S.Ct. at 1060 n. 4, 55 L.Ed.2d at 277 n. 4 (emphasis added).

The police in this case did exactly what the Supreme Court suggested would have been improper for the officer involved in *Ceccolini* to do. They were attempting to find witnesses when they violated the defendant's *Miranda* rights.

The stated philosophy of the detectives was to ignore the requirements of *Miranda* and to let the courts sort it all out later. The state is ill-served by such disregard for the law, and this case and the resulting reversal is a prime example of such ill-service. The factor of police motivation strongly militates in favor of exclusion.

### B. Time Lapse

■ In considering the factor of time lapse, the trial court found that the length of time between the illegal behavior of the police, the witness' decision to cooperate, and the actual testimony at trial went in favor of the state. These three factors had been considered in *Ceccolini* to determine if the testimony given by the witness was an act of free will. 435 U.S. at 279–80, 98 S.Ct. at 1062, 55 L.Ed.2d at 279.

The trial court found that the eighteen months between the "behavior of the police officer" and Champion's actual trial testimony placed the time lapse factor on the side of the state. Given the circumstances of this case, we believe that the trial court applied this factor too mechanically. In *Ceccolini*, the Court noted that "[s]ubstantial periods of time elapsed between the time of the illegal search and the initial contact with the witness, on the one hand, and between the latter and the testimony at trial on the other." *Id.* The *Ceccolini* court found these lapses of time to be significant because the witness maintained a willingness to testify despite an opportunity to back out.

However, an examination of the time periods involved in this case, we believe, indicates that the time lapse factor favors exclusion. As for the first time period, the police contacted Champion immediately following their illegal interview with the defendant. As for the second time period, it is true there was an eighteen-month gap between Champion's initial police interview and his trial testimony. But as soon as Champion cut a deal with the police (a mere two weeks after the *Miranda* violation), he opened himself up to significant harm if he refused to testify. If he did not keep his end of the agreement by being a cooperative witness, the state would prosecute him for the La Quinta robbery and would also refuse to help him on his outstanding marijuana charges. As a matter of fact, his marijuana charges were still pending when he gave his trial testimony. In effect, Champion had no real opportunity to back out once he made his deal without suffering extremely adverse personal consequences.

Under these circumstances, the eighteen-month period is of little significance because, unlike the witness in *Ceccolini*, it did not indicate that Champion had a long-term willingness to testify. Indeed, the

record indicates he was demonstrably reluctant to testify at trial.

At trial Champion intimated that he felt forced to testify. His hostility while testifying ultimately led to the prosecutor stating:

> I would ask for leave to use leading questions with Mr. Champion, because I think especially after his testimony yesterday, he's a hostile witness. He's not a state's witness. He's accused the state of threatening him with his—with, quote: "busting my ass." I submit he's hardly a fully cooperative state's witness ... So I would ask leave to ask leading questions, and I think that would solve the problem.

Here the time-lapse factor favors exclusion.

## C. Role of Unlawful Interrogation

■ The third factor which the court considered in *Ceccolini* was the connection between the illegally-obtained evidence and the role it played in gaining the witness' cooperation. The trial court properly found that this factor cut against the state. The plain fact is that, two and one-half years after the crimes, the police didn't have a clue that Champion was a potential witness in either the Wong or Tinker cases. The identity of Champion came solely and exclusively from the illegal questioning and the state never would have found Danny Champion without it. In *Ceccolini*, on the other hand, the Court noted that both the identity of the witness and her relationship with the defendant were well known by the police prior to any police impropriety. 435 U.S. at 279, 98 S.Ct. at 1062, 55 L.Ed.2d at 279.

At least two courts have excluded live witness testimony in cases where the identity of the witness was completely unknown to the police before the misconduct. In *United States v. Scios*, 590 F.2d 956, 963 (D.C.Cir.1978), the court excluded the testimony because "Massa's existence as a potential witness was entirely unknown to the authorities before they searched Scio's files." In *Commonwealth v. Lahti*, 398 Mass. 829, 501 N.E.2d 511 (1986), *cert. denied*, — U.S. —, 107 S.Ct. 1895, 95 L.Ed.2d 502 (1987), the court approved the exclusion of testimony where the police engaged in misconduct designed to discover witnesses apparently unknown to them. Because the unlawful interrogation led directly to the witness Champion and he would not otherwise have been discovered, this third factor weighs heavily in favor of exclusion.

## D. Willingness of Witness to Testify

■ The trial court found that the final factor—the alleged willingness of the witness to testify—weighed in favor of the state. This factor may be the most difficult of the four to evaluate and has been subject to disparate interpretations by state and federal courts.

The Court's application of the willingness-to-testify standard was straightforward in *Ceccolini*. The witness in *Ceccolini* was not a suspect in the case, she was studying police science, and she had an affirmative interest in testifying. We do not think that Champion, who was summoned from the streets some two and one-half years after the crimes in question, and who was immediately told that the police were aware of his participation in the La Quinta robbery, can be said to have made statements which were "truly the product of detached reflection and a desire to be cooperative on the part of the witness." 435 U.S. at 277, 98 S.Ct. at 1060, 55 L.Ed.2d at 277. He clearly testified to avoid prosecution on the La Quinta robbery and on his outstanding marijuana charges.

We do, however, recognize that *Ceccolini* is not limited to cases involving "good-citizen" witnesses. *See, e.g., United States v. Schaefer*, 691 F.2d 639 (3d Cir.1982) (witness' decision to testify was a voluntary decision to promote his own interests with respect to sentencing); *see also Hooton*, 662 F.2d 628 (*Ceccolini* not limited to good-citizen witnesses testifying out of civic duty); *Leonardi*, 623 F.2d 746 (permitting testimony of unindicted co-conspirator); *United States v. Brookins*, 614 F.2d 1037 (5th Cir.1980) (testimony was in no way coerced although partially induced by grant of immunity); *United States v. Stevens*,

612 F.2d 1226 (10th Cir.1979), *cert. denied,* 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1113 (1980) (fact that testimony of an accomplice came as part of a plea bargain into which the accomplice entered did not diminish violation of his coming forward to implicate defendant); *People v. Briggs,* 709 P.2d 911 (Colo.1985) (describing distinction between coerced and voluntary immunized testimony).

However, what the Supreme Court focused on in *Ceccolini* was the presence of realistic options. The witness in *Ceccolini* had the option not to testify and yet she still chose to do so many months later. Here, Champion had no realistic options. He arrived at the police station and was confronted with the officers' accusations. They explained to him that if he agreed to cooperate and testify they would agree not to charge him with the La Quinta crimes and would also help him in his pending marijuana charges. Obviously, the implication is that he will be prosecuted if he doesn't testify. The trial court stated that Champion's deal and resulting testimony were voluntary because the officers did not have probable cause to arrest Champion. They did, of course, have defendant's statement (albeit illegally obtained) implicating Champion in the La Quinta robbery. More importantly, Champion was not under the impression the police could not arrest him. Throughout, he maintained that they threatened to do just that if he did not cooperate.

In *United States v. Scios* the court said:

In the present case, it is plain that Massa's giving of testimony—before the grand jury, and presumably at the trial—is purely and simply a product of coercion. Massa's decision to testify is not a matter of choice, or free will, but made solely to avoid being jailed for contempt. His decision to testify in such circumstances can hardly be what Judge Burger had in mind in *Smith and Bowden* [*v. United States,* 117 U.S.App.D.C. 1, 324 F.2d 879 (1963)] when he spoke of the "human personality whose attributes of will, perception, memory and *volition* interact to determine what testimony he will give."

590 F.2d 956, 961 (D.C.Cir.1978) (citations omitted).

Champion's testimony here is similarly coerced. Obviously, he was initially unwilling to testify—for two and one-half years he had not felt the urge to step forward and confess. At the station he was told that the police knew of his participation in the La Quinta robbery. From the questions during his interview, he could not have been unaware that there was an ongoing homicide investigation and that he was quite possibly a suspect in it. He could avoid being charged for the La Quinta robbery and get help on his unrelated marijuana charges *only* if he agreed to testify.

The state makes much of the two-week period between the time the deal was made and the second interview, claiming the time span is evidence that Champion's testimony was the product of his free will. We disagree. The two interrogations are interrelated. A review of the transcript of the first interrogation reveals that the two homicide detectives were clearly interested in the Wong murder. They repeatedly asked Champion about his activities the day of the murder. His return two weeks later, after consultation with his attorney, to relate defendant's alleged confession to the Wong murder is intrinsically linked to the coercion exerted upon him at the first interrogation.

In short, under the circumstances of this case, all four *Ceccolini* factors favor the suppression of Champion's testimony because it is the direct result of illegal police activity and it is not sufficiently attenuated to be otherwise admissible.

## ADMISSIBILITY OF REYNALDO TAPIA'S STATEMENTS

At trial, defendant sought to blame both the Wong murder and the La Quinta robbery on one Frank Martinez. Martinez testified and denied any involvement in either of the crimes. Another witness, Johnny Urias, testified that Martinez had admitted that he had committed the La Quinta robbery and had shot a Chinese lady (presumably Mrs. Wong). Defendant sought to

have another witness, Reynaldo Tapia, testify similarly to Urias, but Tapia invoked the fifth amendment. Defendant then sought to introduce a tape-recorded statement that Tapia had given to the police. In the statement, Tapia claimed that he and Martinez were sniffing glue in a park when Martinez left to rob "that Chinese store" and returned "about one and one-half hours later ... breathing hard and very tired and started telling everyone there that he shot the lady at the store."

■ On appeal, defendant initially claims that the trial court erred in sustaining Tapia's claim of fifth amendment privilege. Because defendant never objected to Tapia's invocation of the privilege in the trial court, that issue is waived on appeal. Rule 103(a), Ariz.R.Evid. 17A A.R.S.; *see generally State v. Thomas*, 130 Ariz. 432, 435, 636 P.2d 1214, 1217 (1981). If Tapia successfully claims the privilege at a retrial, however, the admissibility of his statement may again be an issue so we deal with it now.

■ The defendant urges the admissibility of Tapia's statement under Rule 804(b)(5), Ariz.R.Evid.—the residual hearsay exception for unavailable witnesses.[3] Rule 804(b)(5) allows hearsay evidence to be admitted if it possesses adequate circumstantial guarantees of trustworthiness, is evidence of a material fact, and if justice would be served by its admission. *State v. Smith*, 138 Ariz. 79, 84, 673 P.2d 17, 22 (1983), *cert. denied*, 465 U.S. 1074, 104 S.Ct. 1429, 79 L.Ed.2d 753 (1984). The statement must be both strongly probative and circumstantially reliable. *See State v. Ramirez*, 142 Ariz. 171, 177, 688 P.2d 1063, 1069 (App.1984).

In *State v. Robles*, 135 Ariz. 92, 659 P.2d 645 (1983), this court rejected a mechanical approach to Rule 804(b)(5) and held that a trial court should examine each case individually by analyzing a number of factors including:

1. The presence of oath or cross-examination.
2. The ability of the declarant to perceive clearly.
3. The amount of time between the event and the declaration.
4. The presence of corroborative evidence.
5. The self-incriminatory nature of the declaration.
6. Whether the declaration was unambiguous and explicit.
7. Whether multiple levels of hearsay are involved.

*Id.* at 95, 659 P.2d at 648.

The trial court complied with *Robles* and made the following individualized findings and observations concerning the proffered testimony, which we summarize as follows:

1. No presence of cross-examination in the prior interview.
2. The time between the alleged confession and the crime was short, weighing for the defense.
3. While there was corroboration due to the fact that appellant had presented another witness who also testified that Martinez had confessed to him; the fact that Tapia's statement was not against his own interest and that he incriminated Martinez in his own murder case rendered the third factor neutral for either side.
4. The witness' statement, while initially unambiguous, was retracted somewhat in interviews with the prosecution.
5. That there are multiple levels of hearsay as appellant offered to introduce what the police said Tapia said Martinez said.

The trial court then noted the unique unreliability of the proffered evidence:

So, that's, you know—and then ultimately the thing that strikes me as peculiar in this case is that unique situation

---

**3.** We note that Rule 804(b)(3) specifically relates to statements against interest where the declarant is unavailable and may impose a more stringent standard of corroboration than does Rule 804(b)(5) when the statement against criminal interest is being offered to exculpate an accused. However, as noted, both in the trial court and here, the statement has been offered, and the legal issue presented, solely under Rule 804(b)(5), so we deal with it as such.

where Tapia is now labeling Martinez as the killer in a case where he's charged with first-degree murder.

And that places a whole difficult aspect of evaluation that should be inquired by the jury, and which can't be inquired by the jury if he takes the Fifth amendment.

So, under all those circumstances, it seems to me very difficult to say "Well, it's fair to bring all this evidence in, you know; it's such a—so close on the line."

But that aspect to me is so important that the jury should be able to determine, you know, something of this nature. Until he takes the Fifth they don't know, you know, that he's named Martinez as a killer in another matter. Is he amplifying his—his case by testifying that Martinez was a killer in another case also?

Well, you say "No, that's not true because he made this statement originally in '82, and this happens in '84."

\* \* \* \* \* \*

It leads to such collateral issues that the probative value at a certain point becomes questionable, specifically since we've already got before the jury that Martinez told the gentleman yesterday that he had shot a Chinese woman and that he had been involved in—I don't remember—the La Quinta robbery was also mentioned. I can't remember if he specifically said that.

So, we've already got the statement from Martinez through this other witness who had none of these complications that in fact that this had occurred.

So, I think that under that analysis, the motion to permit all the evidence, that hearsay evidence pursuant to that rule is denied.

This is exactly the type of analysis, tailored to the individual case, that is required by *Robles*. Exclusion of this type of evidence by the trial court will not be disturbed on appeal absent a clear abuse of discretion. *Robles*. There was no such abuse of discretion so we affirm the decision of the trial court.

## TESTIMONY BY THE STATE'S WITNESSES ON VOLUNTARINESS

Defendant argues that his rights were violated by the manner in which the state's experts testified both at the pretrial motion to suppress and at trial. At the time of the suppression hearing, Nancy Kirkman, a counselor for the Cochise County jail, testified regarding the events surrounding Bravo's statements. Kirkman used defendant's initial invocation of his right to remain silent as some evidence that the defendant's statements were voluntary. At the same hearing, Edward Gelardin, a physician specializing in psychiatry who twice evaluated Bravo for competency, also testified. In support of his opinion, he relied on the fact that defendant invoked his right to remain silent as well as on that portion of the statement obtained in violation of *Miranda*. Gelardin did not specifically mention any particular portion of the suppressed statement. At trial, Gelardin also testified that defendant's responses to questions from Detectives Lowe and Gonzales were rational and coherent.

Defendant claims that the trial judge erred in permitting the witness to use his *Miranda* rights invocation as a partial basis for their opinions. Arizona courts have recognized that protection against self-incrimination includes freedom from adverse consequences flowing from defendant's exercise of his fifth amendment rights. *State v. Carrillo*, 156 Ariz. 125, 750 P.2d 883 (1988). Normally, any reference by a judge or a prosecutor about a defendant's protected silence will constitute fundamental error. *State v. Anderson*, 110 Ariz. 238, 517 P.2d 508 (1973). *Miranda* warnings carry an implicit assurance that a defendant's choice to remain silent will carry no penalties. *Carrillo*, 156 Ariz. at 134, 750 P.2d at 892 (citing *Doyle v. Ohio*, 426 U.S. 610, 618–19, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91, 96 (1976)). Having said that, we find it helpful to discuss the pretrial and trial proceedings separately.

### A. Pretrial Testimony

■ At the pretrial motion to suppress Kirkman testified as follows:

THE PROSECUTOR: Now, in terms of Mr. Bravo, and in terms of his behavior, emotional state at the time that you were speaking to him in your office, did you believe that Mr. Bravo was understanding what was being said to him and understanding what he was saying? ...

THE WITNESS: Initially, I wasn't sure whether or not Alex was understanding.

I was convinced that he did understand at the point in which he became—well, I don't know if he became frightened or not. The point at which he decided not to talk to Frank Martinez appeared in reaction to what I had been telling him, that it indeed was a very serious thing, that he was about to tell the detective, that it could be used against him.

And he appeared aware of that and that's what changed his mind.

And I think at that point I became convinced that Alex did know that, that he did understand.

Dr. Gelardin testified at the pretrial voluntariness hearing as follows:

And then, as I understand it, after he's read his rights, he has some brief second thoughts and—which is kind of a rational response one might expect to hearing one's rights; it reminds you of all the trouble you may be in later.

And so, he—the fact that he has some second thoughts, and I feel like he barely presumes that was the basis of his second thoughts, so that interaction to me is important.

If such evidence were presented to a jury as evidence of defendant's consciousness of guilt or of his sanity, it would be error. The first use is prohibited by *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed. 2d 91 (1976), and the second is prohibited by *Wainwright v. Greenfield*, 474 U.S. 284, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986). However, Bravo claims that his confession and his initial waiver of *Miranda* rights were involuntary because of his mental condition and because of the medication. We recently held that neither *Doyle* nor *Wainwright* forbids the evidentiary use of a defendant's invocation of his *Miranda* rights to rebut defendant's contention that he did not understand his rights. In *Carrillo* we said:

[W]e believe there are limits on how far an accused may stretch the *Wainwright* principle. It strains reality to hold that a defendant may invoke *Miranda* to stop further questioning and later freely argue that contemporaneous admissions were involuntary because he could not assert his *Miranda* rights. We do not penalize defendant for exercising his *Miranda* rights. We do not believe the implicit promise of freedom from penalty recognized in *Doyle* and *Wainwright* embraces the concept that defendant may simultaneously claim his rights and, without fear of contradiction, claim he did not understand the rights he claimed. We hold that evidence of exercise of *Miranda* rights was admissible on the question of comprehension of those rights.

*Carrillo*, 156 Ariz. at 131–32, 750 P.2d at 889–90.

Additionally, in *Carrillo*, we held that in order for a waiver of *Miranda* rights to be voluntary, a defendant must understand his rights and intend to waive them and that the decision to waive must not have been compelled by governmental impropriety. We held that a trial court's finding that a mentally retarded defendant made a knowing and intelligent waiver of his *Miranda* rights was supported by the interrogating officer's testimony that defendant actually understood his rights, and by a police psychologist's testimony that defendant understood the *Miranda* warnings. Just as in this case, the psychologist in *Carrillo* based his opinion in part on the defendant's exercise of his constitutional rights during an interrogation. 156 Ariz. at 130, 750 P.2d at 888. There was no error in the receipt of the experts' opinions on voluntariness at the pretrial motion to suppress.

B. Trial Testimony

█ Before Dr. Gelardin testified at trial, the trial court carefully instructed him to avoid any reference to the suppressed portion of the confession and to discuss

only his conclusions from studying the confession. This approach, suggested by the trial court, was approved in *Wainwright.* In *Wainwright,* the state argued to the Court that post-*Miranda* silence is vital evidence of a defendant's sanity and therefore should be admissible. 474 U.S. at 293, 106 S.Ct. at 640, 88 L.Ed.2d at 631–32. The Court acknowledged that the state had a legitimate interest in proving defendant's rationality. The Court suggested that that interest could be constitutionally fulfilled "by carefully framed questions that avoided any mention of the defendant's exercise of his constitutional rights to remain silent and to consult counsel." 474 U.S. at 295, 106 S.Ct. at 640, 88 L.Ed.2d at 632.

We believe that the trial court's control over Gelardin's testimony kept his testimony within constitutional bounds. Moreover, Rule 703, Arizona Rules of Evidence, provides that an expert may base an opinion on facts or data which "need not be admissible in evidence." *State v. Mauro,* 149 Ariz. 24, 32, 716 P.2d 393, 401 (1986), *rev'd on other grounds,* 481 U.S. 520, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987). The expert is also not precluded from using evidence even if the evidence is suppressed by the trial court. *State v. Mitchell,* 106 Ariz. 492, 497, 478 P.2d 517, 522 (1970). Gelardin did not mention the suppressed confession or defendant's invocation of his rights; therefore his testimony did not violate any constitutional right of defendant.[4]

## CONCLUSION AND DISPOSITION

The trial court's ruling concerning the admissibility of the non-suppressed portions of the defendant's statements is affirmed, as is its ruling excluding the Tapia statement. There was no error in the receipt of the Gelardin and Kirkman testimony at the suppression hearing or at the trial. However, the failure of the police to honor defendant's *Miranda* rights require the suppression of the Champion testimony. Defendant's convictions are reversed and this cause is remanded to the trial court for a new trial in accordance with this opinion.[5]

GORDON, C.J., FELDMAN, V.C.J., and CAMERON and HOLOHAN, JJ., concur.

---

4. In a portion of the prosecution's final argument to the jury, the prosecutor arguably refers to the defendant's invocation of rights. In fact, no such evidence was before the jury. For the first time in his reply brief, the defendant claims error by reason of the prosecutor's argument. Since we are remanding for other reasons and have no reason to believe the misstatement will be repeated, we do not deal with it further.

5. In making this remand, we are mindful that the felony murder conviction is apparently based on a jury finding that defendant attempted an armed robbery of Mrs. Wong and that the jury found defendant not guilty of a completed armed robbery of Mrs. Wong. We are also mindful that no lesser-included offense instruction was given on attempted armed robbery. We have no way of knowing how the parties may elect to proceed hereafter. We caution the parties that the order of remand herein should not be read as impliedly deciding any legal issues other than those expressly resolved in this opinion.